### The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Plaintiff,

v.

### ARTHUR ANDERSEN & CO., Gerald Lee, Mervyn Silver, Joseph Heilbrun, and Hornblower & Weeks-Hemphill, Noyes, Inc., Defendants.

No. 79 Civ. 4882 (RJW).

United States District Court, S.D. New York.

March 16, 1987.

17. 18 U.S.C. § 3651.

18. *See, e.g., United States v. Nunez,* 573 F.2d 769 (2d Cir.), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978).

19. 28 U.S.C. § 2255.

1226

Breed, Abbott & Morgan, New York City, and Wilson & McIlvaine, Chicago, Ill. (Edward J. Ross, James D. Zirin, James J. Sabella, New York City, Charles W. Board, Chicago, Ill., of counsel), for defendant Arthur Andersen & Co.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Allan M. Pepper, Alan F. Goott, Mark Sanford Epstein, of counsel), for plaintiff.

ROBERT J. WARD, District Judge.

This is an action brought pursuant to § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. Jurisdiction is alleged under § 27 of the 1934 Act, 15 U.S.C. § 78aa, the laws of the State of New York, and principles of pendent jurisdiction. In brief, plaintiff asserts claims of fraudulent misrepresentation under both federal securities law and New York state law in connection with plaintiff's acquisition of eight million dollars in principal amount of promissory notes from Frigitemp Corp. ("Frigitemp") pursuant to a loan agreement dated October 15, 1976. Defendant Arthur Andersen & Co. ("Andersen") moves pursuant to Rules 12(b)(1), 12(b)(6) and 56, Fed.R.Civ.P., to dismiss the amended complaint and grant summary judgment as to Andersen on the grounds that the Court lacks subject matter jurisdiction over the instant action and that the amended complaint fails to state a claim against Andersen upon which relief can be granted. For the reasons hereinafter stated, Andersen's motion for summary judgment is granted and the amended complaint is dismissed in its entirety.

## BACKGROUND

The instant action is yet another episode of federal court litigation arising from the financial collapse of the Frigitemp Corporation.[1] Despite the protracted history of the lawsuit before this Court, the following facts are undisputed.

### The Parties

Plaintiff, the Equitable Life Assurance Society of the United States ("Equitable"), is a mutual life insurance company[2] organized and operating under New York law. In the course of operating its insurance business, Equitable engages in a range of financial transactions. These include the purchase of publicly traded stocks, corporate debentures and government obligations, as well as the extension of mortgage loans to corporations, and the "direct" or "private placement" of long-term corporate debt obligations.[3] Transcript of Deposition of John D. Miller ("Miller Tr.") at 11–14.

Defendant Andersen is a public accounting firm with offices worldwide, including an office in New York City. Andersen was specifically engaged to examine and report on financial statements of Frigitemp for fiscal years 1973 through 1976.

Defendants Lee, Silver and Heilbrun were officers and directors of Frigitemp at the time relevant to the instant action.[4]

---

1. Two cases arising from Frigitemp's financial troubles and ultimate bankruptcy have reached the Second Circuit. *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), involved federal securities law and state law claims brought against Andersen by four commercial banks that had made a series of loans to Frigitemp. In *In re Frigitemp Corp.*, 753 F.2d 230 (2d Cir.1985), the Second Circuit reviewed a district court's ruling on the treatment by Frigitemp's trustees in bankruptcy of payments made by Frigitemp to its outside counsel prior to filing in bankruptcy.

2. *See* Transcript of Deposition of Arthur C. Smiley ("Smiley Tr.") at 21.

3. According to John D. Miller, vice president in Equitable's direct placement areas, a typical direct placement with Equitable would involve Equitable's extension of an unsecured loan to a corporation for approximately fifteen years evidenced by a loan agreement and an unregistered note. Transcript of Deposition of John D. Miller ("Miller Tr.") at 18 and 24–26. The funds acquired by the corporation through such a direct placement might be used as "project financing," *id.* at 18, or in the long-term refinancing of bank loans. *Id.* at 23.

4. Plaintiff avers upon information and belief that Lee was Chairman of the Board, Chief Executive Officer, and a director of Frigitemp;

Hornblower & Weeks-Hemphill, Noyes, Inc. ("Hornblower"), also joined as a defendant, was at all times relevant to this action a partnership in the investment banking field.[5] Hornblower assisted Frigitemp in the private placement of the promissory notes with Equitable. These notes form the basis of the instant lawsuit.[6]

Frigitemp, which is not joined as a defendant in the instant action,[7] is a New York corporation engaged in the manufacture and installation of furnishings and interiors for naval and merchant vessels, commercial establishments and institutional facilities. In particular, the company sold and installed specialized marine insulation. On March 20, 1978, Frigitemp filed a petition for an arrangement pursuant to Chapter XI of the Bankruptcy Act, former 11 U.S.C. § 701 *et seq.* The company was adjudicated bankrupt on May 29, 1979.

### The Transaction

In March 1976, Hornblower approached the head of Equitable's Direct Placement Department[8] with a proposal for the private placement of seven million dollars in fifteen-year senior notes of Frigitemp and 400,000 shares of Frigitemp's convertible preferred stock. *See* Transcript of Deposition of Arthur Smiley ("Smiley Tr.") at 30–21; *see also* Affidavit of Edward J. Ross ("Ross Affidavit"), Exhibit I (Hornblower Private Placement Memorandum) ("Hornblower Memorandum"). It was represented to Equitable that the proceeds of the placement would be used to repay certain revolving credit bank lines, as well as to refinance existing long-term indebtedness and provide additional working capital. Hornblower Memorandum at 15.

Based on materials Hornblower had submitted to Equitable, including its private placement memorandum and a copy of Frigitemp's latest annual report, Hornblower's private placement proposal was initially reviewed by one of Equitable's investment analysts, Arthur C. Smiley,[9] who summarized his conclusions in a memorandum to John D. Miller, then an Assistant Vice President in Equitable's Direct Placement Department. *See* Ross Affidavit, Exhibit K ("Smiley Memorandum"). In the memorandum, Smiley recommended that Equitable proceed with further evaluation of Hornblower's placement proposal, but that Equitable consider "[t]hree key changes" in the terms of the placement. Smiley recommended, first, that the interest rate on the Frigitemp notes be in-

---

Silver was Executive Vice President, Chief Operating Officer, and a director of Frigitemp, and Heilbrun was Senior Vice President, Treasurer, and a director of Frigitemp. Amended Complaint at ¶¶ 10, 11 and 12. Only defendant Heilbrun has appeared in the instant action. The record indicates that service of the original complaint on defendants Lee and Silver was never effected. *See* Docket Entry # 10 (Summons with Marshal's Return).

5. Hornblower's successor, Hornblower, Weeks, Noyes & Trask, Inc., subsequently formed a partnership with another entity under the name of Loeb Rhoades, Hornblower & Co. ("Loeb Rhoades"). Loeb Rhoades had been named as a defendant in the original complaint, and asserted in its motion to dismiss that "the Hornblower firms" were the real parties in interest. *See* Memorandum in Support of Loeb Rhoades' Motion to Dismiss at 2–3.

6. By Stipulation and Order dated May 20, 1981, plaintiff's pursuit of the instant action against Hornblower and Hornblower's defense were held in abeyance with leave to reinstate the action upon forty-five days written notice by either party to the other.

7. Plaintiff alleges that Frigitemp was not named as a party defendant in this lawsuit because of the operation of an automatic stay of court proceedings against Frigitemp as a consequence of its having filed a petition in bankruptcy. *See* Amended Complaint at ¶ 7. *See also* Rule 401, Rule of Bankruptcy Procedure.

8. The nomenclature of Equitable's various departments and subgroups has changed several times in the last ten to fifteen years. *See* Miller Tr. at 6–9, 14–16. It appears, however, that at least at the time the Frigitemp private placement proposal was being evaluated by Equitable the operative title of the department involved was the Direct Placement Department. *See* Affidavit of Edward J. Ross ("Ross Affidavit"), Exhibit E (organizational chart and personnel list of Direct Placement Department for 1976).

9. In 1976, Smiley was a Senior Investment Analyst within the Loan Acquisition and Management subgroup of Equitable's Direct Placement Department. *See* Ross Affidavit, Exhibit E.

creased;[10] second, that the proposed five-year moratorium on repayment of principal on the notes be eliminated; and third, that Frigitemp acquire additional equity either prior to or concurrent with the placement of its senior notes. *See* Smiley Memorandum at 5.

Further study of Hornblower's proposal followed, but it soon became apparent that Equitable would consider entering into a private placement transaction with Frigitemp only if two prerequisites were satisfied. The first was that the placement be limited to senior notes. Equitable's Direct Placement Department at the time was only interested in acquiring debt obligations, and therefore it "had no intention of participating in the subordinated convertible preferred portion of the proposed issue." Smiley Tr. at 41. The second condition was that Frigitemp raise some additional junior capital, either in the form of subordinated debentures or preferred or common stock. Equitable's Direct Placement Department was concerned that Frigitemp "didn't have enough equity or junior capital ...," and therefore advised Hornblower that it would have to "get some junior money in" before Equitable would seriously consider a private placement of Frigitemp notes. Miller Tr. at 32.

Hornblower acted promptly on Equitable's second precondition, and by June of 1976 had assisted Frigitemp in making a public offering of five million dollars in fifteen-year convertible subordinated debentures. *See* Miller Tr. at 32–33; *see also* Ross Affidavit, Exhibit J (Prospectus for Frigitemp Corp. 920 Convertible Subordinated Debentures Due May 31, 1991, dated June 8, 1976). At about the same time that Equitable was informed that the public debt offering was in progress, members of Equitable's Direct Placement Department working on the Frigitemp placement proposal—primarily Smiley and Miller—began an in-depth investigation of Frigitemp's financial situation. *See* Miller Tr. at 33–34. This included a review of Frigitemp's annual reports and other reports filed with the SEC, as well as financial information provided by Frigitemp in response to specific questions Equitable had posed. Smiley Tr. at 50–55. In addition, Equitable personnel made "trade checks" of certain of Frigitemp's suppliers and customers to assess Frigitemp's credit standing. *Id.* at 172–74.

On several occasions, Equitable personnel met with members of Frigitemp's management in an effort to familiarize themselves with Frigitemp's business and assess the capability of Frigitemp's senior managers. There was an initial meeting held in Equitable's offices, at which "the general business prospects for Frigitemp" were discussed. Smiley Tr. at 45–46. Later Miller and Smiley made a "field trip" to the site of one of Frigitemp's joiner projects in Pascagoula, Mississippi. There, they toured two of the ships on which Frigitemp was working and met with Frigitemp personnel on the site. Their purpose in making the trip was "to learn the business, get a feel for it, ... get to know the management a little bit." Miller Tr. at 43–50. Finally, a luncheon meeting was arranged in order "for [Equitable's Senior managers] to get to know [Frigitemp's] management personally...." Miller Tr. at 77–78. Discussion at the luncheon included conversation about Frigitemp's earnings and sales history, important contracts on which the company currently was working, and Frigitemp's contemplated use of the proceeds of the proposed placement transaction. *Id.* at 78–81.

Based on the information garnered from Frigitemp's financial reports and other sources, Arthur Smiley drafted a memorandum of financial terms for the placement of eight million dollars in promissory notes by Frigitemp. *See* Smiley Tr. at 58; *see also* Ross Affidavit, Exhibit N (Frigitemp, Inc. Proposed Memorandum of Terms, dated July 14, 1976) ("Equitable Memorandum of Terms"). This was followed two weeks later by a written recommendation sug-

---

**10.** Smiley's technical recommendation was that there be "an increase in coupon 35–50 basis points." At his deposition, Smiley explained that in his opinion the interest rate on the senior notes that had been proposed by Hornblower was "35 to 50 basis points too low." Instead of the proposed 10½% rate, Smiley would like to have seen 10.85 to 11%. Smiley Tr. at 37.

gesting purchase of the notes that included a summary of the proposed terms of the Frigitemp transaction and provided background on Frigitemp's business and financial position. *See* Smiley Tr. at 57–58; *see also* Ross Affidavit, Exhibit M (Purchase Suggestion for Frigitemp Corporation 10¼% Promissory Notes, dated July 27, 1976) ("Equitable Purchase Suggestion"). This purchase recommendation was first submitted for approval to an investment committee of Equitable officers and then to an investment committee of Equitable's board of directors. Smiley Tr. at 57.

Beginning in mid-July of 1976, shortly after Smiley's proposed memorandum of terms had been circulated, the Direct Placement team working on the Frigitemp Note transaction communicated daily with officials at Hornblower and Frigitemp to negotiate the final terms of the notes. Smiley Tr. at 151–52. Terms that were the subject of negotiation by the parties included, among other things, the interest rate on the notes, their maturity, and various prepayment and repayment provisions. Miller Tr. at 34. Deposition testimony and documentary materials submitted to the Court

in conjunction with the instant motion for summary judgment reveal that the final terms of the Frigitemp notes were derived from three sources. Some of the terms initially proposed by Hornblower in its private placement memorandum were accepted by Equitable and appear relatively unchanged in the final placement document.[11] Others were generated by Equitable alone and were the subject of a proposed memorandum of terms, subsequent to which they were incorporated without change into the final placement documents.[12] However, as suggested above, many if not most of the terms of the transaction resulted from negotiations between the parties.[13]

Once the Frigitemp placement proposal had been approved by the relevant investment committees at Equitable, and the key terms of the transaction had been agreed upon by the parties, Equitable retained outside counsel to prepare a draft of the loan agreement. *See* Affidavit of John D. Miller ("Miller Affidavit") at 5–6; *see also* Deposition Transcript of Richard M. Allen ("Allen Tr.") at 14. While the placement terms incorporated in the draft of the agreement were those that had been specif-

---

**11.** For example, the limitation on Frigitemp's acquisition of additional unsecured senior funded debt originally included in Hornblower's private placement memorandum was adopted by Equitable in its proposed statement of terms and finally incorporated into the loan agreement reached between the parties. *See* Smiley Tr. at 104–05; *see also* Ross Affidavit, Exhibit I (Hornblower Private Placement Memorandum) ("Hornblower Memorandum") at 7; Ross Affidavit, Exhibit N (Frigitemp Inc. Proposed Memorandum of Terms, dated July 14, 1976) ("Equitable Memorandum of Terms") at 2; Ross Affidavit, Exhibit A (Loan Agreement for 10¼% Promissory Notes Due 1979–1990 of Frigitemp Corp. dated October 15, 1976) ("Loan Agreement") at 30.

**12.** The provisions for optional repayment or prepayment of principal, for example, were developed by a member of the Equitable team working on the Frigitemp proposal without any input by Frigitemp personnel. Smiley Tr. at 59. These provisions were originally incorporated into Equitable's proposed memorandum of terms, *see* Equitable Memorandum of Terms at 2, and were later set forth in greater detail in the loan agreement itself, *see* Loan Agreement at 21–26.

**13.** On the interest rate for the notes, for example, Hornblower had initially proposed 10½%,

and Smiley's preliminary recommendation had been that the rate be increased to as high at 11%. *See supra* text accompanying note 10. No doubt because of a drop in prevailing interest rates, however, the rate on the Frigitemp notes was ultimately set at 10¼%. *See* Miller Tr. at 35.

The maturity on the notes was also negotiated between the parties. Hornblower had proposed a fifteen year maturity in its original private placement memorandum, but the final maturity on the Frigitemp notes was between thirteen and fourteen years. *See id.* at 36–37.

The various limitations on Frigitemp's activity in the form of negative covenants in the loan agreement were the subject of extensive negotiation between the parties. One such limitation was on Frigitemp's acquisition of additional secured long-term bank borrowings. Equitable originally proposed a cap of $80 million or 75% of the aggregate amount of financing receivables. Frigitemp's counterproposal would have raised the percentage measure to 90%. Equitable ultimately accepted the 90% figure for financing receivables incurred after December 31, 1975, but preserved the 75% figure for receivables incurred before that date. *See* Smiley Tr. at 71–72.

ically negotiated by Equitable and Frigitemp, the format and language of the agreement was drawn primarily from "boilerplate," that is, from similar documents that had been drafted by outside counsel for earlier transactions. Allen Tr. at 17.

The initial draft of the agreement prepared by counsel was first sent to Equitable for review. *Id.* at 20. After officials at Equitable had had an opportunity to comment on the draft, and suggest changes, *id.* at 22–23, an all-day meeting was held at Equitable's offices to review the revised draft with Frigitemp personnel. *Id.* at 25–26. Frigitemp also suggested changes in the document, some of which were incorporated into the final draft. *Id.* at 26–27. The Frigitemp transaction was finally formalized in a loan agreement dated October 15, 1976 ("Loan Agreement" or "Agreement").

### Terms of the Loan Agreement

The Loan Agreement provided for Frigitemp's borrowing eight million dollars from Equitable, to be evidenced by one or more promissory notes ("Frigitemp Notes" or "Notes").[14] The principal on the Notes was to mature in annual installments of $650,000 beginning in 1979, with a final installment of $850,000 due in 1990. Interest due on the unpaid principal was fixed at an annual rate of 10¼%. Loan Agreement, § 1.

Frigitemp represented in the Agreement that it would "apply the entire proceeds of the loan ... to repay loans from financial institutions ... which were incurred for various corporate and business operating purposes, and related expenses." *Id.*, § 2.15. Frigitemp further represented that

neither it nor Hornblower had offered the Notes for sale through general solicitation or advertising. *Id.*, § 2.14. Both Frigitemp and Equitable represented that the Notes were offered and acquired "for investment" rather than resale or distribution. *Id.*, §§ 2.14 and 3.

The eight million dollar loan to Frigitemp was unsecured. Smiley Tr. at 86. However, the Loan Agreement provided that no subsequently incurred debt could take priority over Equitable's claims under the Notes. Loan Agreement, § 9.5. Moreover, the Agreement limited, both in type and amount, the additional debt Frigitemp could incur. *Id.*, § 9.6. The Agreement also placed restrictions on Frigitemp's ability to acquire security interests, subordinate existing claims, assume rental obligations, sell and lease back property, make investments and guarantees, issue dividends, dispose of property, consolidate or merge, transact business with "affiliates,"[15] and make optional payments of other debt obligations. *Id.*, §§ 9.7–9.16. In addition, Frigitemp was required under the Agreement to maintain certain debt-equity ratios, *id.*, § 9.11, to furnish Equitable with financial statements on a regular basis, *id.*, § 6, and to allow Equitable to inspect its property, books and records "at such reasonable times and intervals as the Lender [Equitable] may desire." *Id.*, § 7.

The Loan Agreement provided that, upon one or more events of default, Equitable could accelerate payment of principal and interest due on the Notes and pursue any available legal or equitable remedies to enforce its rights. *Id.*, § 11.2.[16] Frigitemp further covenanted that, upon any such default, it would pay to Equitable the costs

---

**14.** Pursuant to the Loan Agreement, five Notes were transferred to Equitable. Two Notes in aggregate principal amount of $3.5 million were dated October 28, 1976; three Notes in aggregate principal amount of $4.5 million were dated January 11, 1977. Andersen Statement of Material Facts Pursuant to Civil Rule 3(g) ("Andersen 3(g) Statement"), ¶ 10.

**15.** In the Loan Agreement, "affiliate" refers to a control person, or group of persons, such as the

beneficial owner of 5% or more of a class of Frigitemp voting stock, a corporation in which Frigitemp beneficially owns 5% or more of a class of voting stock, or an entity in which Frigitemp owns 5% or more of the equity interest. *See* Loan Agreement, § 10.1 at 44–45.

**16.** The Agreement provided that both it and the Notes, as well as any amendments to either, would be governed by New York law. *See* Loan Agreement, § 23.

and expenses of collecting the amount due. *Id.*[17]

### Subsequent Events

Following the closing on the Loan Agreement, Frigitemp found itself in a "cash bind" as a result of having entered into additional contracts at the same time that certain outstanding receivables remained unpaid. *See* Miller Tr. at 105. In the spring of 1977, Hornblower called a meeting of Frigitemp's lenders—including Equitable—to brief them on Frigitemp's financial predicament and to solicit from the bank lenders additional short-term loans for the company. At the meeting, the banks expressed unwillingness to lend additional short-term funds to Frigitemp unless all Frigitemp's lenders did the same. Equitable's representatives at the meeting, however, stated that they "weren't in the business of short-term lending," *id.* at 104, and in fact Equitable did not participate in the bank's subsequent short-term financing of Frigitemp. *Id.* at 106–7.

By fall of 1977, Equitable was treating its original extension of funds to Frigitemp as a "troubled loan." Miller Tr. at 10. Frigitemp sought—and Equitable agreed to—certain modifications of the provisions of the Loan Agreement. *Id.* at 109–11. Nevertheless, Frigitemp eventually defaulted under the Agreement. *Id.* at 105. Equitable accelerated the payments due on the Notes, and Frigitemp filed for bankruptcy. *Id.* at 114. In the bankruptcy proceedings that followed, John Miller of Equitable chaired the creditors' committee. *Id.* at 116.

### The Instant Lawsuit

Equitable filed the original complaint in the instant action in September of 1979, charging certain of Frigitemp's officers and directors, as well as Hornblower's successor firms and Andersen, with violation of § 10(b) of the 1934 Act and Rule 10b–5 thereunder, and with common law fraud. Equitable alleged in the complaint that in extending the eight million dollar loan to Frigitemp, it had relied to its detriment upon memoranda, financial statements and other representations prepared, published or certified by the defendants, *see* Complaint, § 17, and that defendants knew or should have known that the representations made were materially false and misleading. *See e.g., id.,* ¶ 23.

In response to motions to dismiss brought by Hornblower's successor and Andersen, the Court dismissed the original complaint but granted Equitable leave to file an amended complaint detailing with greater specificity the statements Equitable claimed to have been false, as to which each defendant had knowledge, and upon which Equitable had relied in acquiring the Frigitemp notes. Equitable filed an amended complaint in September of 1980, substituting Hornblower for their successor organization, and realleging its Rule 10b–5 and common law fraud claims with greater particularity.

Andersen subsequently moved to dismiss the amended complaint on the grounds that the underlying transaction between Equitable and Frigitemp had not involved a purchase or sale of a security within the meaning of § 10(b) of the 1934 Act, or alternatively, that the amended complaint failed to state a claim against Andersen upon which relief could be granted. After hearing argument on the motion to dismiss, the Court denied the motion without prejudice to the filing of a motion for summary judgment upon completion of discovery on the issue of whether the Frigitemp Notes are "securities."

Andersen conducted limited discovery on the subject of the process by which the transaction formalized in the Loan Agreement and accompanying Notes came about. Following discovery, Andersen filed the instant motion for summary judgment, reasserting its argument that the Loan Agreement and Notes do not constitute a "security" under the 1934 Act, and in addition contending that no private right of action exists under Rule 10b–5 where, as in this case, another express remedy is available

---

17. The Agreement provided elsewhere that Frigitemp would pay all expenses and taxes inci-

dent to the transaction itself.

under the federal securities laws.[18] The Court subsequently heard argument on the instant motion, and accepted additional submissions from the parties addressing the relevance of certain circuit court decisions, most particularly the Second Circuit's decision in *Chemical Bank v. Arthur Andersen & Co.*[19]

## DISCUSSION

### I. Summary Judgment

A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983), "[t]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a Court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Insurance, supra*, 804 F.2d at 12. The motion then is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

This action is appropriate for summary judgment because the Court finds that there are no material factual issues in dispute and that the legal question of whether the Frigitemp notes are securities is dispositive of the case.

### II. Interpretation of the Securities Laws

The *sine qua non* of a federal court's jurisdiction over a claim under section 10(b) of the 1934 Act is a misrepresentation "in connection with the purchase or sale of [a security]." 1934 Act § 10(b), 15 U.S.C. § 78j(b). Equitable asserts that this requirement is satisfied by the Notes received by it pursuant to the 1976 loan agreement. Andersen, on the other hand, argues that the Notes are not securities.

#### A. The Law in the Second Circuit

Section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), in pertinent part, provides that "unless the context otherwise requires," the definition of security includes "any note" with the exception of "any note,

---

**18.** Andersen contends in the instant motion for summary judgment that express civil remedies exist under both § 18(a) of the 1934 Act, 15 U.S.C. § 78r(a), and § 12 of the 1933 Act, 15 U.S.C. § 77*l*. *See* Andersen Memorandum in Support of Motion for Summary Judgment ("Andersen Memorandum") at 48. Because the Court finds that the Frigitemp Notes are not securities, the Court does not reach Andersen's second argument.

**19.** 726 F.2d 930 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). As noted *supra* note 1, this case involved claims of federal securities and common law fraud brought against Andersen by Frigitemp's bank lenders. At issue were promissory notes given to the banks by Frigitemp in late 1976 and early 1977, as well as replacement notes and note endorsements involved in the refinancing of Frigitemp's debt in August 1977.

draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." [20] Were it not for the prefatory language "unless the context otherwise requires," the 1934 Act construed literally would cover no note with a maturity not exceeding nine months, and would cover all notes with a maturity over nine months. However, courts have observed that literally interpreting the broad statutory definition might produce irrational results, either overinclusive or underinclusive, and therefore they have relied on the prefatory language to distinguish those instruments Congress intended to include in the definition from those which it did not. *Banco Nacional de Costa Rica v. Bremar Holdings Corporation*, 492 F.Supp. 364, 368 (S.D.N.Y.1980); *see American Bank & Trust Co. v. Wallace*, 702 F.2d 93, 94 (6th Cir.1983) ("[C]ourt's, however, have declined to apply the letter of the law under circumstances which would violate the spirit of the law.").

In this Circuit, the determination of whether promissory notes are securities is guided by Judge Friendly's views in *Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir.1976) and *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). After finding the tests adopted in the other circuits [21] to be lacking, and observing that the Supreme Court's "investment contract" test in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), was of "dubious value" in evaluating notes, Judge Friendly concluded that "the best alternative now available may lie in greater recourse to the statutory language." *Exchange National Bank of Chicago v. Touche Ross & Co., supra*, 544 F.2d at 1136–37. Observing that the plain terms of the 1934 Act state that a note over nine months is a security unless the context otherwise requires, Judge Friendly described the appropriate test to be applied as follows:

> A party asserting that a note of more than nine months maturity is not within

**20.** Section 3(a)(10) of the 1934 Act provides:
   (a) When used in this chapter, unless the context otherwise requires—
   (10) The term "security" means any notes, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

**21.** The Ninth and Sixth Circuits, for example, have used a "risk capital" test. *See Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (1976); *Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Under this test the ultimate inquiry is whether the note

holder has contributed "risk capital" subject to the "entrepreneurial or managerial efforts" of the issuer of the note. *Great Western Bank & Trust v. Kotz, supra*, 532 F.2d at 1257. In making this inquiry, six factors are to be considered: 1. the time of the note; 2. the existence and extent of collateralization; 3. the form of the obligation; 4. the circumstances of issuance; 5. the relationship between the amount borrowed and the size of the borrower's business; and 6. the contemplated use of the proceeds.

The Third, Fifth, Seventh and Tenth Circuits generally utilize a "commercial investment dichotomy." *See Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir.1973); *National Bank of Commerce v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir.1978); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *McGovern Plaza Joint Venture v. First Denver*, 562 F.2d 645 (10th Cir.1977). Under this approach, the Court must determine whether the plaintiffs are simply borrowers in a commercial transaction who are not protected by the 1934 Act or investors in a securities transaction who are protected. *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., supra*, 508 F.2d at 1359. Deciding whether a transaction is of a commercial or investment nature generally involves a case-by-case factual determination. *Id.* at 1362.

the 1934 Act (or that a note with a maturity of nine months or less is within it) ... has the burden of showing that 'the context otherwise *requires*.' [Judge Friendly's Emphasis] One can readily think of many cases where it does—the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply. We realize this approach does not afford complete certainty but it adheres more closely to the language of the statutes and it may be somewhat easier to apply than the weighing and balancing of recent decisions of sister circuits.

*Id.* at 1134–38 (footnote omitted).

*Exchange National Bank* was clarified in *Chemical Bank v. Arthur Andersen & Co., supra,* 726 F.2d at 939, where Judge Friendly stated that the list of examples of notes not within the nine month maturity exception to the Act, which were nonetheless not securities, was "not graven in stone." While leaving the burden on the litigant to demonstrate that the "context otherwise requires" an interpretation that a note over nine months is not a security, Judge Friendly added "notes evidencing loans by commercial banks for current operations" to the list of notes longer than nine months where the context otherwise requires that they not be treated as securities. *Id.*

■ In this case, there is no question that the notes at issue are longer than nine months. Anderson, therefore, had the burden of showing that "the context otherwise requires" the exclusion of the Frigitemp Notes from the definition of security. To prevail on their motion, then, defendants have to prove to the Court that the Notes bear "a strong family resemblance" to the examples given by Judge Friendly in *Exchange National Bank* or *Chemical Bank.*

### B. Strong Family Resemblance to a Commercial Loan

■ Analyzing the transaction in this case, the Court is satisfied that the defendants have met their burden of demonstrating that the Frigitemp Notes bear a strong family resemblance to notes evidencing loans by commercial banks for current operations. Similar to commercial banks, insurance companies today make loans within the regular course of their business. Examining the Frigitemp Notes and the circumstances surrounding their issuance, this Court finds that general practices of commercial financing, the format of the parties' agreement, the negotiation of the transaction, and the parties' perceptions all indicate that the Notes strongly resemble notes evidencing loans by commercial banks for current operations. Therefore, the Court holds that the Notes are not securities under the 1934 Act.

### 1. Insurance Companies and Commercial Lending

For many years, insurance companies, like commercial banks, have been in the business of making term loans to industrial corporations. While insurance company loans have traditionally been long-term and commercial bank loans short to medium-term, the two industries have recently become direct competitors offering similar services.[22]

---

**22.** *See* Andersen Memorandum at 29. *See also* Wash. Post, Nov. 23, 1986, at K 1 (financial services industry in recent years has undergone "dramatic changes that have substantially eroded the longstanding distinctions" between banks and insurance companies); Newsweek, May 3, 1982, at 64 ("In short [Prudential insurance company] has become a commercial bank in everything but name."). An article in American Banker commenting on the issue of competition between banks and insurance companies found changes in loan maturities to be very significant:

Equitable, like many large insurance companies, makes term loans within the regular course of its business. R.L. Eaton, the Vice-President of the Loan Acquisition and Management subgroup of Equitable's Direct Placement Department, testified that the most frequent type of placement transaction Equitable engaged in consisted of transactions where Equitable purported to be the lender and some company to whom it was transferring money purported to be the borrower. Ross Affidavit, Exhibit C, at 16. Arthur Smiley, a Senior Investment Analyst also in Equitable's Loan Acquisition and Management subgroup, testified that typically Equitable was approached by companies seeking to initiate private placement transactions. Ross Affidavit, Exhibit A, at 12. The Frigitemp transaction was of this type and was in fact initially modeled after a previous loan transaction in which Equitable and others lent money to Bristol Steel. Ross Affidavit, Exhibit B., at 16.

2. Characteristics of Transaction Strongly Resemble Commercial Loan

Analyzing the specifics of the transaction at issue, the Court finds that many, if not most, of the characteristics of the parties' agreement indicate that a commercial loan was being made. Not only was the agreement drafted in the form of a loan transaction with negotiations being based upon standard loan forms, but the resulting obligation was not subordinated to other indebtedness. In addition, Equitable, under the terms of the agreement, retained a significant amount of control over Frigitemp's financial operations and the uses to which Frigitemp could put the proceeds of the loan. All of these factors lead the Court to conclude that the Notes bear a strong family resemblance to notes evidencing loans by commercial banks for current operations.

Initially, it is clear to the Court that the written agreement between the parties represents that Equitable was lending money to Frigitemp. The Equitable-Frigitemp Loan Agreement consistently refers to Equitable as the "Lender." Describing the Notes, the Loan Agreement states that Frigitemp "proposes to *borrow* the aggregate sum of $8,000,000 from the Lender, on the Closing Dates hereinafter specified *such borrowings* to be evidenced by one or more registered notes of the Company." Loan Agreement, § 1 (emphasis added). Throughout, the Agreement uses the terms "Lender," "loan," and "borrow." *See e.g.,* Loan Agreement, §§ 1, 2, 2.14, 2.15, 2.18, 3, 4, 5. *See generally Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1259 (9th Cir.1976) (loan agreement "which consistently referred to the parties as 'borrower' and 'lender'" found not to be a security).[23] In addition to utilizing loan terms in their agreement, the parties based their negotiations on a standard loan form consisting in part of boilerplate terms. Such a form was also used by Equitable in previous transactions. *See* Ross Affidavit, Exhibit B, at 14–19. The use of such a form as the basis for the initial draft of the loan agreement resembles the practices of commercial banks which frequently use standard forms when negotiating term loans. *See Exchange National Bank of Chicago v. Touche Ross & Co., supra,* 544 F.2d at 1138.

The loan by Equitable was also similar to a commercial loan in that it was not subordinated to the other indebtedness of Frigitemp. Although neither the Notes nor the Loan Agreement make reference to subor-

Traditionally, commercial banks have lent short and insurance companies have lent long, with no overlap. Bank financing usually involved a short-term line of credit with some term financing for two to five years. Insurance company financing usually called for maturities of 12 to 35 years, with concentration in the 20–year area. Although both banks and insurance companies still provide such maturities, the late 1970s and 1980s witnessed banks doing term financing ranging up to 10 years and insurance companies doing financings with maturities of as short as one to two years.
This overlap created numerous instances of companies considering bank term financing as an alternative to a traditional private placement ... and vice versa.
American Banker, March 6, 1981, at 20.

**23.** The use of such terms indicates that the parties themselves perceived the transaction as a loan. See *infra* text accompanying notes 36–38.

dination, plaintiff concedes that it is "indisputably true" that the Frigitemp notes were unsubordinated. Memorandum of the Equitable Life Assurance Society of the United States in Opposition to Motion for Summary Judgment, at 27. This conclusion is amply supported by the facts in the record. In July 1976, Equitable had initially refused to lend money to Frigitemp because Equitable's position would not be sufficiently senior. It was only after Frigitemp completed a public offering of debentures to provide junior money that Equitable agreed to enter into the transaction with Frigitemp. Miller, the assistant vice president of the Portfolio Management subgroup of Equitable's Direct Placement Department, testified that Equitable only wanted to participate in a transaction where it would have a senior position to other subordinated debt. *See* Ross Affidavit, Exhibit D, at 32–33. In addition, Smiley, the Senior Investment Analyst in the Loan Acquisition and Management subgroup of Equitable's Direct Placement Department, stated that it was his understanding that the Notes would be senior notes and not be subordinated. *Id.*, Exhibit A, at 84.

The significance of subordination is twofold. In *Exchange National Bank of Chicago v. Touche Ross & co., supra,* 544 F.2d at 1138, Judge Friendly found the characteristic of subordination to be "[m]ore important of all" in determining whether a note is a security. Moreover, commercial bank loans are generally not subordinated to equity indebtedness. Unlike the notes in *Exchange National Bank,* which were subordinated, the Frigitemp Notes clearly lack a subordinated character. Not only does this factor weigh against finding them to be securities, *see id.* at 1138, but it also suggests that the transaction between Equitable and Frigitemp strongly resembles that of a commercial bank loan.

Another characteristic of the agreement between Equitable and Frigitemp which indicates that a loan transaction as opposed to a security transaction was occurring was the amount of financial control Equitable retained over Frigitemp. The Loan Agreement limited the activities of Frigitemp and its subsidiaries in many ways. *See e.g.* Loan Agreement, §§ 6, 7, 9.6–9.16. Specifically, Section 9.6 of the Loan Agreement, entitled Limitations on Indebtedness, provided that "[t]he Company will not, and will not permit any Restricted Subsidiary to, create, assume, incur or guarantee, or otherwise become or be liable (whether absolutely, contigently or otherwise) in respect of, any Indebtedness," other than certain specified types of limited indebtedness, including the Frigitemp Notes. *Id.*, § 9.6. In addition, section 9.8, entitled Limitations on Rental Obligations and Sale of Leaseback, restricted the aggregate amount of Frigitemp's rental payments and the ability of the company to "sell and leaseback any Operating Property." *Id.*, § 9.8. Frigitemp, in the Limitation of Liens or Subordination of Rights section of the Loan Agreement, was prohibited from creating or assuming "any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind," unless it fell within a specified exception. *Id.*, § 9.7. Moreover, the Company agreed in the Limitation on Investments and Guarantees section not to "make, acquire or suffer to exist any Investment" other than those specifically permitted by the Loan Agreement. *Id.*, § 9.9. The Agreement also placed limitations on Frigitemp's and its subsidiaries' ability to issue dividends, dispose of shares, consolidate or merge, dispose of property, make optional payments of other indebtedness, and make transactions with affiliates. *Id.*, §§ 9.10–9.16.

The Loan Agreement placed very strict limitations on Frigitemp's financial condition. Frigitemp was required to

maintain at all times (i) Consolidated Current Assets equal to at least 150% of Consolidated Current Liabilities, (ii) before April 1, 1978, Consolidated Net Working Capital equal to at least 80% of Consolidated Funded Indebtedness and (iii) on and after April 1, 1978, Consolidated Net Working Capital equal to at least 100% of Consolidated Funded Indebtedness.

*Id.*, § 9.11. Moreover, as long as Equitable held the Notes, Frigitemp, during each ac-

counting quarter, was required to provide Equitable with a large number of financial statements and accounting reports. This extensive disclosure included, *inter alia*, copies of Frigitemp's consolidated balance sheets, income statements, and written reports of the company's chief financial officer concerning additional indebtedness incurred by the company and insuring that such indebtedness was in compliance with the restrictions set in the Loan Agreement. *Id.*, § 6. Finally, Equitable was given the right to

> visit and inspect any of the properties of the Company or of its Subsidiaries, to examine the books of account and records of the Company and of its Subsidiaries, to make copies and extracts therefrom, to discuss the affairs, finances and accounts of the company and of its Subsidiaries with, and to be advised as to the same by, its and their officers and employees and its and their independent public accountants, all at such reasonable times and intervals as the Lender may desire.

*Id.*, § 7.[24] The failure to observe or comply with the foregoing restrictions and duties constituted a default under the Loan Agreement and permitted acceleration. *Id.*, § 11.1.

Such extensive restrictions and control as possessed by Equitable in the Loan Agreement have been recognized by the Supreme Court as inconsistent with a securities transaction. In *Marine Bank v. Weaver*, the Supreme Court emphasized that a provision under which lenders "could veto future loans gave them a measure of control over the operation of the [business] not characteristic of a security." 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982). Similarly, the Ninth Circuit in *Great Western Bank & Trust v. Kotz, supra*, 532 F.2d at 1259–60, recognized that where a lender maintains significant control over a borrower, risk is reduced and the resulting transaction is not covered by the securities acts. Describing the transaction, which like the Equitable-Frigitemp agreement was evidenced by a loan agreement and a promissory note, the Court stated:

> [The lender] restricted [the borrower's] use of the proceeds. It required [the borrower] to maintain a certain minimum consolidated working capital and current position. It restricted [the borrower's] future unsecured borrowing. [The borrower] could not effect organic change without [the lender's] consent. [The borrower's] records and property were subject to [the lender's] inspection upon reasonable request. Should [the borrower] miss a payment, [the lender] was entitled to immediate acceleration.
>
> In short, [the lender] left very little to chance.

*Id.* at 1259.[25] Under these circumstances, the Ninth Circuit found that the only risk assumed by the lender was "that risk normally associated with the lending of money for a period of time." *Id.* Considering the agreement between the parties to be a "commercial financing transaction," the court held that the promissory note given by the borrower bore "no economic resemblance to the 'securities' defined by the 1933 and 1934 acts." *Id.* at 1260. It concluded that "[t]o expand the reach of those acts to ordinary commercial loan transac-

---

24. This section also provided that Frigitemp, within reasonable limits, would provide Equitable with the opportunity to obtain information necessary to verify the accuracy of Frigitemp's representations and warranties. Loan Agreement, § 7.

25. The court in *State Mutual Life Assurance Company of America v. Arthur Andersen*, [1976–77 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 95,897 at 91,309 (S.D.N.Y.1977), reached an opposite result where "the degree of direct control by [the lender] over the operation of the business was not as extensive as it might have been." Unlike the significant restrictions placed upon Frigitemp by Equitable in the Loan Agreement, the lender in *State Mutual* only placed limitations on the borrower's net worth and funded indebtedness. Commenting on these controls, the court observed that while these were "reasonable steps which were taken to reduce the riskiness of the investment," they did not directly involve the lender in the "day to day operations" of the borrower. *Id.* In contrast, the significant controls exercised by Equitable over Frigitemp in the Loan Agreement placed Equitable in a position where it was directly involved in Frigitemp's basic operations.

tions would distort congressional purpose as we interpret it." *Id.*

Similar to the transactions in *Marine Bank* and *Great Western Bank,* the lender in the transaction at issue here retained significant control over the borrower. This Court finds that Equitable's extensive "measure of control" over Frigitemp is consistent with a commercial financing transaction as opposed to a securities transaction.

The final characteristic of the loan agreement which indicates that the Frigitemp Notes bear a strong family resemblance to commercial bank notes is that use of the proceeds of the Notes was limited to the maintenance of Frigitemp's current financial position. By adding "notes evidencing loans by commercial banks *for current operations* " to the examples listed in *Exchange National Bank* of notes that could not properly be regarded as securities, the Second Circuit recognized the importance of the borrower's contemplated use of the proceeds of a note in determining whether a note is a security. *Chemical Bank v. Arthur Andersen & Co., supra,* 726 F.2d at 939 (emphasis added). The Ninth Circuit observed in *Great Western Bank & Trust v. Kotz, supra,* that

> [p]roceeds constituting an essential ingredient of enterprise formation ('participation in the pot luck of the enterprise,' ...), are generally securities. On the other hand, those used to maintain current financial position generally are not.... Generally funds spent on current operations generate faster return

than do funds used for capital expenditure.

532 F.2d at 1258.

Similar to the transactions in *Chemical Bank* and *Great Western Bank,* the usage of the proceeds of the loan by Equitable was limited under the agreement to the maintenance of current operations. The Loan Agreement between Equitable and Frigitemp required Frigitemp to "apply the entire proceeds of the loan ... to repay loans from financial institutions (as indicated in Exhibit C),[26] which were incurred for various corporate and business operating purposes, and related expenses." Loan Agreement, § 2.15. By restricting proceeds of the loan to the refinancing of current indebtedness, the Frigitemp Notes strongly resemble the additional example given by Judge Friendly in *Chemical Bank* of notes where the "context otherwise requires" they not be treated as securities. *See Chemical Bank v. Arthur Andersen & Co., supra,* 726 F.2d at 938.[27]

Plaintiff argues that a number of characteristics of the loan agreement differ from a traditional commercial bank loan. In particular, plaintiff asserts that the fact that the Notes were at a fixed rate of interest, unsecured, and long-term mandates the finding that the Notes are securities. Evaluating each of these factors, the Court finds that none of them, either alone or in combination, is sufficiently dispositive so as to require the Court to hold that the Frigitemp Notes are securities.

The interest rate of the Frigitemp Notes was stated at a fixed rate of 10¼%. *See*

---

**26.** Exhibit C to the Loan Agreement is a list of Secured and Unsecured Indebtedness for Money Borrowed of Frigitemp and its Subsidiaries Outstanding as of October 15, 1976.

**27.** In *State Mutual Life Assurance Co. of America v. Arthur Andersen and Co., supra,* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,897 at 91,309, the court found that notes at issue in the case were securities in part because the proceeds of the loan were not limited to current operations:

> The proceeds of the loan were to go for the payment of outstanding indebtedness, but also "for other proper purposes of [the business of Black Watch Farms] as a partnership." Thus, the proceeds were not limited to the

refinancing of current indebtedness but could be put to other uses as well. In this respect, the notes at issue here differ substantially from those considered in *Great Western Bank & Trust* where the court declined to characterize a note of 10–months maturity executed by the debtor in connection with a line of credit of $1,500,000 issued by a bank as a security, partly because the· note was subject to the restriction that the bank's money could be used only as working capital and not for capital expenditures.

Unlike the loan in *State Mutual,* the loan by Equitable limited proceeds to the maintenance of Frigitemp's current financial position. *See* Loan Agreement, § 2.15.

Loan Agreement, § 1. Although plaintiff argues that commercial bank loans typically tie interest to the prime rate [28] and, therefore, a fixed interest rate such as in the Frigitemp Notes is more characteristic of a security, this Court finds that whether the instant rate is fixed or set at the prime rate is not a dispositive factor in deciding whether an instrument is a security. *Compare State Mutual Life Assurance Co. v. Arthur Andersen and Co., supra* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,897 at 91,309 (security found where notes had fixed rate of interest) with *Exchange National Bank of Chicago v. Touche Ross & Co., supra,* 544 F.2d at 1126 (security found where notes had interest based on the prime rate). In fact, many notes which are not securities, such as a mortgage on a home, *see id.* at 1138, bear a fixed rate of interest. The Supreme Court has observed that even a rate of return based on profits does not necessarily mean that something is as security.[29]

Plaintiff also argues that the fact that the Frigitemp Notes were unsecured requires that the Court find that the Notes are securities. The only analysis plaintiff offers in support of its argument is that the notes in *Exchange National Bank of Chicago v. Touche Ross & Co., supra,* which were unsecured, were found to be securities. 544 F.2d at 1139. This argument is unpersuasive. While an unsecured lender is generally more dependent upon the managerial skills of the borrower than is a secured party who can look to the collateral in the event of inability to repay, this factor is not dispositive in the determination of whether a note is a security. *See Marine Bank v. Weaver, supra,* 455 U.S. at 560 n. 10, 102 S.Ct. at 1225, n. 10 (citing with approval *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1258

(unsecured note given to bank in course of a commercial financing transaction is not a security)).[30] The crucial factor is not that the Frigitemp notes were unsecured, but rather that Equitable's extensive control over Frigitemp as established in the Loan Agreement made collateral unnecessary. *Id.* at 1258–59. Under the Agreement, Equitable could declare a default and accelerate the principal at the slightest indication of insecurity. *See* Loan Agreement, §§ 11.1–11.5. Considering the lender's control, Equitable, unlike the typical unsecured lender, was not dependent upon Frigitemp's managerial skills to any significant extent. Moreover, the fact that the Notes were unsecured does not make the transaction unlike a commercial bank loan because many commercial bank loans are unsecured. Frigitemp, in fact, had a number of different types of unsecured indebtedness, including bank loans. *See* Loan Agreement, Exhibit C.

Finally, plaintiff asserts that the long-term nature of the Frigitemp Notes requires that the Court find them to be securities. In support of this argument, plaintiff claims that long-term financing is generally part of a company's capitalization and that since the notes in *Exchange National Bank of Chicago v. Touche Ross & Co., supra,* 544 F.2d 1126, which carried twelve to eighteen month maturities, were securities, the much longer term Frigitemp Notes are securities *a fortiori.* This Court believes that plaintiffs have attempted to put a disproportionate amount of emphasis on the factor of time until maturity. While this Court will not argue with the obvious proposition that "the longer one's funds are to be used by another, the greater the risk of loss," *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1257,[31] this

---

**28.** *See State Mutual Life Assurance Co. v. Arthur Andersen and Co., supra,* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,897 at 91,309.

**29.** *See Marine Bank v. Weaver,* 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982) ("Although the agreement gave the [lenders] a share of the [borrower's] profits, if any, that provision alone is not sufficient to make that agreement a security.").

**30.** The Second Circuit has interpreted the Supreme Court's citation to *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d 1252, using the signal "Cf." as an approving reference. *Chemical Bank v. Arthur Andersen & Co., supra,* 726 F.2d at 938 n. 14.

**31.** It was for this reason that the Sixth Circuit found that time was the "most important factor" of the six factors it considers in determining

Court takes issue with plaintiff's attempt to make this one factor controlling.

The terms of the Notes as described in the Loan Agreement provided that Frigitemp in 1976 would borrow $8,000,000 from Equitable. This principal amount was to mature in annual installments of $650,000 per year from 1979 through 1989, with a final installment of $850,000 due in 1990. Interest would be due on the unpaid principal semiannually, at a rate of 10¼% per annum. Loan Agreement, § 1. While the thirteen year period from the issuance of the Notes to their final maturation is admittedly lengthy, this factor alone is not dispositive in determining whether the Frigitemp Notes are securities.

In *Exchange National Bank of Chicago v. Touche Ross & Co., supra,* the Second Circuit explained the significance of the length of a note, finding that if a note had a maturity exceeding nine months, a party attempting to exclude the note from the purview of the securities laws had the burden of showing that "the context otherwise *requires.*" 544 F.2d at 1138. Once a party satisfies this burden by proving a note with a maturity over nine months bears a strong family resemblance to one of Judge Friendly's examples, the length of the note is no longer of major significance. Indeed, some of Judge Friendly's examples are notes which are generally of a long-term nature. A note secured by a mortgage on a home, for example, is frequently for a term of twenty to thirty years. Similarly, notes delivered in consumer financing and notes evidencing a "character" loan to a bank customer can be of whatever length the lender and borrower agree upon. The Second Circuit, in finding that the Replacement Notes in *Chemical Bank v. Arthur Andersen & Co., supra,* were not securities, assumed *arguendo* that the maturity of these notes exceeded nine months. 726 F.2d at 937. Having made this assumption, the Court went on to conclude that the context of a commercial bank loan required its exclusion from coverage under the 1934 Act.

Moreover, in light of recent changes in the financial services industry, it would appear that the maturity of a note, once it was greater than nine months, is not a controlling factor in determining whether a given note is a security. As this Court has already observed, the term loans offered by commercial banks and insurance companies are becoming more and more similar.[32] It is thus not inconceivable that a commercial bank would enter into a financing transaction with a maturity of over ten years. The long-term maturity of the Frigitemp Notes, therefore, does not in and of itself prevent this Court from finding that the notes bear a strong family resemblance to notes evidencing loans by commercial banks for current operations.

3. Negotiations of Transaction Strongly Resemble Commercial Loan

Evaluating the negotiations which led to the issuance of the Frigitemp Notes lends further support to this Court's conclusion that the notes are not securities. Similar to a commercial loan, not only did the borrower approach the lender initially, but also the lender's loan officers negotiated the transaction and dictated the initial form upon which further negotiations were based. The Notes were also unlike securities in that apart from the boilerplate, the terms were negotiated face-to-face, the transaction was an isolated one, and there was neither a public offering involved nor were the notes designed for public trading. For all of these reasons, the Court concludes that the Frigitemp Notes were given in a commercial context and, thus, similar to a commercial bank loan, they do not constitute "securities" within the purview of the federal securities laws.

From its inception, the negotiations between Equitable and Frigitemp resembled those of a commercial loan transaction. In March of 1976, Frigitemp, the prospective borrower, approached Equitable through Hornblower, proposing Equitable purchase $7,000,000 of senior notes of Frigitemp and 400,000 shares of convertible preferred

---

whether a note is a security. *See Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1257.

**32.** *See supra* note 22 and accompanying text.

stock. Although the final terms of the agreement between Equitable and Frigitemp varied significantly from Frigitemp's original proposal, it is undeniable that the impetus for the transaction came from Frigitemp, as borrower, rather than Equitable, as lender. In this respect, the transaction strongly resembles a commercial loan situation where the party desiring to borrow funds approaches the lending institution to apply for a loan. *See generally American Bank & Trust Company v. Wallace, supra,* 702 F.2d at 96. The Frigitemp transaction also resembled a commercial bank loan in that it was handled by what would be analogous to loan officers in a bank. Unlike the situation in *Exchange National Bank of Chicago v. Touche Ross & Co., supra,* 544 F.2d at 1129, where the transaction was negotiated with the Chief Administrative Officer of the lending institution who was not part of the staff which handled normal commercial loans, the Frigitemp transaction was negotiated by Equitable staff who had the responsibility for making loans and private placements. Smiley was a Senior Investment Analyst in the Loan Acquisition and Management subgroup of the Direct Placement Department, Eaton was the Vice-President of the same subgroup, and Miller was an Assistant Vice President of the Portfolio Management subgroup of the same Department. While plaintiffs argue that Equitable is not a bank and, therefore, it had no staff responsible for handling the making of commercial bank loans, this argument is unpersuasive because an insurance company need not be a bank to engage in transactions bearing a strong family resemblance to commercial loans. If the individuals negotiating the transaction had the responsibility for making Equitable's commercial loans, then the fact that Equitable is an insurance company as opposed to a bank will not in this Court's opinion prevent the transaction from strongly resembling a commercial bank loan.[33]

The Frigitemp transaction also resembles a commercial bank loan in that the lender drafted the initial loan documents and these documents were modeled on standard forms. There is no question that the loan documents and the notes at issue were first drafted by Equitable's lawyers, Cravath, Swaine & Moore. This is similar to a commercial bank loan in that the lending institution usually supplies the forms for the borrower. Richard Allen, the Cravath, Swaine & Moore partner responsible for preparing the basic loan documents, testified at a deposition that a Cravath associate modeled the documents after Equitable precedents used in connection with other transactions. Allen Tr. at 16. In particular, the Frigitemp transaction was based on documents utilized in a loan by Equitable and other lenders to Bristol Steel. *Id.* at 17. Allen testified that insurance companies tend to use standard forms as the basis for negotiating a transaction, stating: "[E]ach insurance company tends to follow its own particular form or format of documents. The language from one transaction to the next will in many cases be identical. The language usually relates to what we call boilerplate. The financial terms of a transaction may vary a great deal from one transaction to the next." *Id.* at 19. This use of standard forms resembles the procedure used by commercial banks. Thus, Equitable's drafting of the initial form of the loan agreement based on boilerplate precedent supports the conclusion that the loan agreement strongly resembles a commercial bank loan. *See Exchange National Bank v. Touche Ross & Co., supra,* 544 F.2d at 1129. Moreover, these facts at the very least cast serious doubt on plaintiff's contention that the notes are securities. It is obvious to the Court that a party selling securities would normally not have the purchaser of such securities draft the necessary forms based on the purchaser's prior transactions with others.

**33.** Plaintiff's argument that the transaction was handled by senior administrative officers due to the approval of the transaction by Equitable's Investments Committee is equally unavailing. The record indicates that the level of involvement by these senior executives was completely insignificant when compared to the primary responsibilities of those in the Loan Acquisition and Management subgroup of the Direct Placement Department.

Additional facts pertaining to the negotiation of the transaction support the conclusion that the Frigitemp Notes are not securities. Apart from the boilerplate provisions in the loan agreement, the specific financial terms of the Frigitemp transaction were unique and negotiated one-on-one by the parties. This factor indicates that the transaction was not a security. *See Marine Bank v. Weaver, supra*, 455 U.S. at 560, 102 S.Ct. at 1225 ("unique agreement, negotiated one-on-one by the parties, is not a security").[34] Moreover, the fact that the agreement between Frigitemp and Equitable was an isolated transaction with the resultant notes not designed for public trading indicates that no offering of securities occurred. *See Exchange National Bank of Chicago v. Touche Ross & Co., supra*, 544 F.2d at 1139; *Great Western Bank & Trust v. Kotz, supra*, 532 F.2d at 1258. In *Marine Bank v. Weaver, supra*, the Supreme Court stressed that a critical factor in determining whether an instrument is a security is whether it is part of a private transaction and not designed to be publicly traded:

> The unusual instruments found to constitute securities in prior cases involved offers to a number of potential investors, not a private transaction as in this case. In *Howey*, for example, 42 persons purchased interests in a citrus grove during a 4-month period. 328 U.S., at 295 [66 S.Ct., at 1101]. In *C.M. Joiner Leasing*, offers to sell oil leases were sent to over 1,000 prospects. 320 U.S. [344] at 346 [64 S.Ct. 120 at 121, 88 L.Ed. 88]. In *C.M. Joiner Leasing*, we noted that a security is an instrument in which there is "common trading." *Id.*, at 351 [64 S.Ct. at 123]. The instruments involved in *C.M. Joiner Leasing* and *Howey* had equivalent values to most persons and could have been traded publicly.
>
> Here, in contrast, the Piccirillos distributed no prospectus to the Weavers or to other potential investors, and the unique agreement they negotiated was not designed to be traded publicly.

455 U.S. at 559-60, 102 S.Ct. at 1125-26.

Similar to the transaction in *Marine Bank v. Weaver*, the parties in this case negotiated a unique agreement to suit their needs. Although the Frigitemp Notes could theoretically be transferred, *see Exchange National Bank of Chicago v. Touche Ross & Co., supra*, 544 F.2d at 1138-39, the agreement between the parties was purely private and the Notes were not intended for public trading.[35] Frigitemp did not make a public offering of the Notes. It did not attempt to solicit involvement from a large group of investors. The Loan Agreement states that neither the Company nor Hornblower had "offered the Notes for sale by means of any form of general solicitation or general advertising." Loan Agreement, § 2.14. In addition, the Agreement provided that the Notes were not offered for resale or distribution. *Id.* Also in the Agreement is a representation by Equitable that it had not acquired the Notes with a view toward their sale or distribution and that it had no present intention of selling the Notes. *Id.*, § 3. Under these circumstances, this Court is of the view that the Frigitemp Notes cannot be considered securities.

---

**34.** In reaching this conclusion, the Supreme Court cited *Great Western Bank & Trust v. Kotz* with approval. *See supra* note 30. The court used the following parenthetical to describe Justice Wright's concurring opinion: "unsecured note, the terms of which were negotiated face-to-face, given to a bank in return for a business loan, is not a security." *Marine Bank v. Weaver, supra*, 455 U.S. at 560, 102 S.Ct. at 1225.

**35.** In fact, Smiley testified that the secondary market for the Frigitemp Notes was "very limited." Ross Affidavit, Exhibit A at 85. There is no indication that Equitable ever attempted to offer the Notes to anyone in the secondary market. In contrast, a security was found to exist in *Banco Nacional de Costa Rica v. Bremar Holdings*, 492 F.Supp. 364, 369 (S.D.N.Y.1980), where the lender took promissory notes "intending to recover at least some of its expenditure immediately by selling or hypothecating the notes in the secondary market." Unlike the situation in *Banco Nacional* where the notes were issued "precisely to facilitate their placement in the secondary market," 492 F.Supp. at 369, the Frigitemp Notes were never intended to be sold. *See* Loan Agreement, § 3.

### 4. Perceptions of the Parties

Examining the perceptions of the parties, this Court finds further support for its conclusion that the transaction bears a strong family resemblance to a commercial loan. Initially, it is clear that Frigitemp perceived the transaction as equivalent to its other commercial bank loans. In Exhibit C to the Loan Agreement, Frigitemp lists its borrowings as of 1976 under the heading of "UNSECURED INDEBTEDNESS FOR MONEY BORROWED OF THE COMPANY." Within this category the transaction with Equitable is categorized as Notes Payable, as are transactions with commercial banks, such as Chemical Bank and Security-Pacific National Bank. *See* Loan Agreement, Exhibit C. Equitable also perceived of the transaction as a loan. As previously noted, the Loan Agreement repeatedly utilized language such as "lender," "loan," and "borrow."[36] Moreover, J.D. Miller, the Assistant Vice President of Equitable's Portfolio Management Division of the Direct Placement Department, testified that his division included an Investment Recovery Division which handled "troubled loans" and that the Frigitemp Loan fell into that category. *See* Ross Aff. Exhibit D, at 9–10.[37]

The fact that the Loan Agreement states that the Notes "have been offered solely for investment and not for resale or distribution," Loan Agreement, § 2.14, and that Equitable represented that it acquired the Notes for investment as opposed to sale, Loan Agreement, § 3, does not indicate that the Frigitemp Notes are securities.[38] As the Seventh Circuit accurately observed in *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.:*

> In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day. On the other hand, the polarized extremes are conceptually identifiable: buying shares of common stock of a publicly-held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money, is a loan. In between is a gray area which, in the absence of further congressional indication of intent or Supreme Court construction has been and must be in the future subjected to case-by-case treatment.

508 F.2d 1354, 1359 (7th Cir.1975), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).

On this spectrum, the transaction between Frigitemp and Equitable was clearly a commercial loan. Thus, Equitable was not an investor purchasing a "security" under the 1934 Act.

---

**36.** *See* text accompanying note 23, *supra.*

**37.** Miller described the treatment of the Frigitemp transaction during his deposition:

> Q Does your area of responsibility at the moment include the Frigitemp matter?
> A The Frigitemp, yes. If there is any responsibility for it, it would be in my area.
> Q So you would view that as being in the category of a troubled loan?
> A Well, it is beyond trouble; it is at the point where it has been written off and the bankruptcy has been completed. It is on our Schedule X, which means that it is no longer on our books.
> Q Was there a time when it was treated as a troubled loan?
> A Yes.
> Q When was that, Mr. Miller?
> A Signs of its being in trouble were in 1977, I believe, and the first closing was in 1976. In the spring there was some evidence of trouble and then that fall it would have been considered in trouble. We didn't have a formal work-out division at that point.
> Q You mean in the fall of 1977, it would have been treated as a troubled loan?
> A Well, it would mostly have been considered as such. We did not have a formal work-out area at that time.

**38.** Moreover, the fact that the parties attempted to fit the transaction into the private placement exception to the registration requirement of the Securities Act of 1933, *see* Loan Agreement, § 2.14, does not indicate a belief that the Notes were securities, but rather, merely demonstrates an abundance of caution due to the unsettled state of the law at the time.

## CONCLUSION

Having examined the financial services industry, the characteristics of the loan agreement, the negotiations of the transaction and the parties' perceptions, this Court concludes that the Frigitemp Notes are not securities in that they bear a strong family resemblance to "notes evidencing loans by commercial banks for current operations." *See Chemical Bank v. Arthur Andersen & Co., supra,* 726 F.2d at 939. Even if the transaction did not bear such a strong resemblance to a commercial bank loan, this Court would find that the circumstances surrounding the parties' agreement are such that the defendant has met its burden of showing that "the context otherwise requires" the exclusion of the transaction from coverage of the 1934 Act. *Id.* at 1138. In reaching this conclusion, this Court is cognizant of the fact that Congress, in enacting the securities laws, "did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver, supra,* 455 U.S. at 556, 102 S.Ct. at 1223 (citing *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1253). A situation such as this, where a note is given to an insurance company in the course of an independently investigated, privately negotiated, and totally unique commercial financing transaction, where no secondary market is contemplated, was not within the conception of the drafters of the securities laws. Expanding the interpretation of the securities laws to include this situation would distort Congressional purpose.

In sum, this Court concludes that the Frigitemp Notes are not "securities" as that term is defined in the Securities and Exchange Act of 1934. Having no federal basis for jurisdiction, this Court declines to entertain plaintiff's pendent state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Falls Riverway Realty Inc. v. City of Niagara Falls N.Y.,* 732 F.2d 38, 42 (2d Cir.1984). Accordingly, Andersen's motion for summary judgment is granted and the amended complaint is dismissed in its entirety.

It is so ordered.