## MARINE BANK *v.* WEAVER ET UX.

No. 80–1562.   Argued January 11, 1982—Decided March 8, 1982

Burger, C. J., delivered the opinion for a unanimous Court.

*Daniel L. R. Miller* argued the cause for petitioner. With him on the brief was *Christine Hall McClure*.

*Andrew J. Conner* argued the cause and filed a brief for respondents.*

Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to decide whether two instruments, a conventional certificate of deposit and a business agreement between two families, could be considered securities under the antifraud provisions of the federal securities laws.

## I

Respondents, Sam and Alice Weaver, purchased a $50,000 certificate of deposit from petitioner Marine Bank on February 28, 1978. The certificate of deposit has a 6-year maturity, and it is insured by the Federal Deposit Insurance Cor-

---

*Briefs of *amici curiae* urging reversal were filed by *Acting Solicitor General Wallace, Stephen M. Shapiro, Ralph C. Ferrara, Frank L. Skillern, Jr.*, and *John E. Shockey* for the United States; and by *William H. Smith, Johanna M. Sabol*, and *Michael F. Crotty* for the American Bankers Association.

*Leonard I. Schreiber* filed a brief for Myrna Ayala as *amicus curiae* urging affirmance.

poration.[1]  The Weavers subsequently pledged the certificate of deposit to Marine Bank on March 17, 1978, to guarantee a $65,000 loan made by the bank to Columbus Packing Co.   Columbus was a wholesale slaughterhouse and retail meat market which owed the bank $33,000 at that time for prior loans and was also substantially overdrawn on its checking account with the bank.

In consideration for guaranteeing the bank's new loan, Columbus' owners, Raymond and Barbara Piccirillo, entered into an agreement with the Weavers.   Under the terms of the agreement, the Weavers were to receive 50% of Columbus' net profits and $100 per month as long as they guaranteed the loan.   It was also agreed that the Weavers could use Columbus' barn and pasture at the discretion of the Piccirillos, and that they had the right to veto future borrowing by Columbus.

The Weavers allege that bank officers told them Columbus would use the $65,000 loan as working capital but instead it was immediately applied to pay Columbus' overdue obligations.   The bank kept approximately $42,800 to satisfy its prior loans and Columbus' overdrawn checking account.   All but $3,800 of the remainder was disbursed to pay overdue taxes and to satisfy other creditors; the bank then refused to permit Columbus to overdraw its checking account.   Columbus became bankrupt four months later.   Although the bank had not yet resorted to the Weavers' certificate of deposit at the time this litigation commenced, it acknowledged that its

---

[1] The certificate of deposit pays $7\frac{1}{2}\%$ interest and provides that, if the bank permits early withdrawal, the depositor will earn interest at the bank's current savings passbook rate on the amount withdrawn, except that no interest will be paid for the three months prior to withdrawal. When the Weavers purchased the certificate of deposit, it could only be insured up to $40,000 by the FDIC.  The ceiling on insured deposits is now $100,000.  Act of Mar. 31, 1980, Pub. L. 96–221, 94 Stat. 147, § 308(b)(1), 12 U. S. C. § 1724(b) (1976 ed., Supp. IV).

other security was inadequate and that it intended to claim the pledged certificate of deposit.

These allegations were asserted in a complaint filed in the Federal District Court for the Western District of Pennsylvania in support of a claim that the bank violated § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b). The Weavers also pleaded pendent claims for violations of the Pennsylvania Securities Act and for common-law fraud by the bank. The Weavers alleged that bank officers actively solicited them to guarantee the $65,000 loan to Columbus while knowing, but not disclosing, Columbus' financial plight or the bank's plans to repay itself from the new loan guaranteed by the Weavers' pledged certificate of deposit. Had they known of Columbus' precarious financial condition and the bank's plans, the Weavers allege they would not have guaranteed the loan and pledged the certificate of deposit. The District Court granted summary judgment in favor of the bank. It concluded that if a wrong occurred it did not take place "in connection with the purchase or sale of any security," as required for liability under § 10(b). The District Court declined to exercise pendent jurisdiction over the state-law claims.

The Court of Appeals for the Third Circuit reversed. 637 F. 2d 157 (1980). A divided court held that a finder of fact could reasonably conclude that either the certificate of deposit or the agreement between the Weavers and the Piccirillos was a security.[2] It therefore remanded for further consideration of the claim based on the federal securities

---

[2] The Court of Appeals also concluded that the pledge of a security is a sale, an issue on which the Federal Circuits were split. We held in *Rubin* v. *United States*, 449 U. S. 424 (1981), that a pledge of stock is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws. Accordingly, in determining whether fraud may have occurred here "in connection with the purchase or sale of any security," the only issue now before the Court is whether a *security* was involved.

laws. The Court of Appeals also reversed the District Court's dismissal of the pendent state-law claims.

We granted certiorari, 452 U. S. 904 (1981), and we reverse. We hold that neither the certificate of deposit nor the agreement between the Weavers and the Piccirillos is a security under the antifraud provisions of the federal securities laws. We remand the case to the Court of Appeals to determine whether the pendent state claims should now be entertained.

## II

The definition of "security" in the Securities Exchange Act of 1934[3] is quite broad. The Act was adopted to restore investors' confidence in the financial markets,[4] and the term "security" was meant to include "the many types of instru-

---

[3] Section 3(a)(10) of the 1934 Act, as set forth in 15 U. S. C. § 78c(a)(10), provides:

"(a) . . . When used in this chapter, unless the context otherwise requires—

. . . . .

"(10) The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity is likewise limited."

We have consistently held that the definition of "security" in the 1934 Act is essentially the same as the definition of "security" in § 2(1) of the Securities Act of 1933, 15 U. S. C. § 77(b)(1). *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 847, n. 12 (1975).

[4] Fitzgibbon, What is a Security? A Redefinition Based on Eligibility to Participate in the Financial Markets, 64 Minn. L. Rev. 893, 912–918 (1980).

ments that in our commercial world fall within the ordinary concept of a security." H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933); quoted in *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837, 847–848 (1975). The statutory definition excludes only currency and notes with a maturity of less than nine months. It includes ordinary stocks and bonds, along with the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits . . . ." *SEC* v. *W. J. Howey Co.*, 328 U. S. 293, 299 (1946). Thus, the coverage of the antifraud provisions of the securities laws is not limited to instruments traded at securities exchanges and over-the-counter markets, but extends to uncommon and irregular instruments. *Superintendent of Insurance of New York* v. *Bankers Life & Casualty Co.*, 404 U. S. 6, 10 (1971); *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344, 351 (1943). We have repeatedly held that the test " 'is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.' " *SEC* v. *United Benefit Life Ins. Co.*, 387 U. S. 202, 211 (1967), quoting *SEC* v. *C. M. Joiner Leasing Corp.*, *supra*, at 352–353.

The broad statutory definition is preceded, however, by the statement that the terms mentioned are not to be considered securities if "the context otherwise requires . . . ." Moreover, we are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud. *Great Western Bank & Trust* v. *Kotz*, 532 F. 2d 1252, 1253 (CA9 1976); *Bellah* v. *First National Bank*, 495 F. 2d 1109, 1114 (CA5 1974).

### III

The Court of Appeals concluded that the certificate of deposit purchased by the Weavers might be a security. Examining the statutory definition, n. 3, *supra*, the court correctly

noted that the certificate of deposit is not expressly excluded from the definition since it is not currency and it has a maturity exceeding nine months.[5]   It concluded, however, that the certificate of deposit was the functional equivalent of the withdrawable capital shares of a savings and loan association held to be securities in *Tcherepnin* v. *Knight*, 389 U. S. 332 (1967).   The court also reasoned that, from an investor's standpoint, a certificate of deposit is no different from any other long-term debt obligation.[6]   Unless distinguishing features were found on remand, the court concluded that the certificate of deposit should be held to be a security.

*Tcherepnin* is not controlling.   The withdrawable capital shares found there to be securities did not pay a fixed rate of interest; instead, purchasers received dividends based on the association's profits.   Purchasers also received voting rights.   In short, the withdrawable capital shares in *Tcherepnin* were much more like ordinary shares of stock and "the ordinary concept of a security," *supra*, at 556, than a certificate of deposit.

The Court of Appeals' also concluded that a certificate of deposit is similar to any other long-term debt obligation commonly found to be a security.   In our view, however, there is an important difference between a bank certificate of deposit

---

[5] The definition of a "security" in the 1934 Act, n. 3, *supra*, includes the term, "certificate of deposit, for a security."   However, this term does not refer to certificates of deposit such as the Weavers purchased.   Instead, "certificate of deposit, for a security" refers to instruments issued by protective committees in the course of corporate reorganizations.   *Canadian Imperial Bank of Commerce* v. *Fingland*, 615 F. 2d 465, 468 (CA7 1980).

[6] In addition, the Court of Appeals noted that the Securities and Exchange Commission had taken the position that certificates of deposit are securities.   However, the SEC has filed a brief as *amicus curiae* in this case, jointly with the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Office of the Comptroller of the Currency, which argues that the Weavers' certificate of deposit is not a security.

and other long-term debt obligations. This certificate of deposit was issued by a federally regulated bank which is subject to the comprehensive set of regulations governing the banking industry.[7] Deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws; advertising relating to the interest paid on deposits is also regulated.[8] In addition, deposits are insured by the Federal Deposit Insurance Corporation. Since its formation in 1933, nearly all depositors in failing banks insured by the FDIC have received payment in full, even payment for the portions of their deposits above the amount insured. 1980 Annual Report of the Federal Deposit Insurance Corporation 18–21 (1981).

We see, therefore, important differences between a certificate of deposit purchased from a federally regulated bank and other long-term debt obligations. The Court of Appeals failed to give appropriate weight to the important fact that the purchaser of a certificate of deposit is virtually guaranteed payment in full, whereas the holder of an ordinary long-term debt obligation assumes the risk of the borrower's insolvency. The definition of "security" in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the con-

---

[7] In *Teamsters* v. *Daniel*, 439 U. S. 551 (1979), we held that a noncontributory, compulsory pension plan was not a security. One of our reasons for our holding in *Daniel* was that the pension plan was regulated by the Employee Retirement Income Security Act of 1974 (ERISA): "The existence of this comprehensive legislation governing the use and terms of employee pension plans severely undercuts all arguments for extending the Securities Acts to noncontributory, compulsory pension plans." *Id.*, at 569–570. Since ERISA regulates the substantive terms of pension plans, and also requires certain disclosures, it was unnecessary to subject pension plans to the requirements of the federal securities laws as well.

[8] See, *e. g.*, 12 U. S. C. § 461(b) (1976 ed., Supp. IV) (reserve requirements); 12 U. S. C. §§ 161, 324, and 1817 (1976 ed. and Supp. IV) (reporting requirements); 12 U. S. C. §§ 481, 483, and 1820(b) (1976 ed. and Supp. IV) (inspection requirements); 12 CFR §§ 217.6 and 329.8 (1981) (advertising).

text otherwise requires. It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws. We therefore hold that the certificate of deposit purchased by the Weavers is not a security.[9]

## IV

The Court of Appeals also held that a finder of fact could conclude that the separate agreement between the Weavers and the Piccirillos is a security. Examining the statutory language, n. 3, *supra,* the court found that the agreement might be a "certificate of interest or participation in any profit-sharing agreement" or an "investment contract." It stressed that the agreement gave the Weavers a share in the profits of the slaughterhouse which would result from the efforts of the Piccirillos. Accordingly, in that court's view, the agreement fell within the definition of "investment contract" stated in *Howey,* because "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U. S., at 301.

Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world, but the agreement between the Weavers and the Piccirillos is not the type of instrument that comes to mind when the term "security" is used and does not fall within "the ordinary concept of a security." *Supra,* at 556. The unusual instruments found to constitute securities in prior cases involved offers to a number of potential investors, not a private transaction as in this case. In *Howey,* for example, 42 persons purchased interests in a citrus grove during a 4-month period. 328 U. S., at 295. In

---

[9] We reject respondents' argument that the certificate of deposit was somehow transformed into a security when it was pledged, even though it was not a security when purchased.

*C. M. Joiner Leasing,* offers to sell oil leases were sent to over 1,000 prospects. 320 U. S., at 346. In *C. M. Joiner Leasing,* we noted that a security is an instrument in which there is "common trading." *Id.,* at 351. The instruments involved in *C. M. Joiner Leasing* and *Howey* had equivalent values to most persons and could have been traded publicly.

Here, in contrast, the Piccirillos distributed no prospectus to the Weavers or to other potential investors, and the unique agreement they negotiated was not designed to be traded publicly. The provision that the Weavers could use the barn and pastures of the slaughterhouse at the discretion of the Piccirillos underscores the unique character of the transaction. Similarly, the provision that the Weavers could veto future loans gave them a measure of control over the operation of the slaughterhouse not characteristic of a security. Although the agreement gave the Weavers a share of the Piccirillos' profits, if any, that provision alone is not sufficient to make that agreement a security. Accordingly, we hold that this unique agreement, negotiated one-on-one by the parties, is not a security.[10]

### V

Whatever may be the consequences of these transactions, they did not occur in connection with the purchase or sale of "securities."[11] The Weavers allege that the bank manipulated them so that they would suffer the loss the bank would

---

[10] Cf. *Great Western Bank & Trust* v. *Kotz,* 532 F. 2d 1252, 1260–1262 (CA9 1976) (Wright, J., concurring) (unsecured note, the terms of which were negotiated face-to-face, given to a bank in return for a business loan, is not a security).

[11] It does not follow that a certificate of deposit or business agreement between transacting parties invariably falls outside the definition of a "security" as defined by the federal statutes. Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.

have borne from the failure of the Columbus Packing Co. Their pendent state-law claims against the bank are not before the Court since the Court of Appeals did not treat the issue of those claims. Accordingly, the case is remanded for consideration of whether the District Court should now entertain the pendent claims.

*Reversed and remanded.*