NATIONAL BANK OF YUGOSLAVIA,
Plaintiff,

v.

DREXEL BURNHAM LAMBERT, IN-CORPORATED, Leon D. Black, Gary S. Davis, Frederick H. Joseph, John H. Kissick, Barry L. Klein, Thomas R. McHale, and Richard J. Wright, Defendants.

No. 90 Civ. 3257 (LLS).

United States District Court,
S.D. New York.

July 8, 1991.

 

Kirkland & Ellis, New York City (Francis M. Holozubiec, William H. Pratt, of counsel), for plaintiff Nat. Bank of Yugoslavia.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Daniel J. Beller, Dina R. Hellerstein, of counsel), for defendant Gary S. Davis.

Sidley & Austin, New York City (Alan M. Unger, of counsel), for defendants Leon D. Black, Frederick H. Joseph, John H. Kissick and Richard J. Wright.

Stroock & Stroock & Lavan, New York City (Melvin A. Brosterman, of counsel), for defendant Barry L. Klein.

Meister, Leventhal & Slade, New York City (Larry Krantz, of counsel), for defendant Thomas R. McHale.

## OPINION AND ORDER

STANTON, District Judge.

In a single motion, defendants Black, Davis, Joseph, Kissick, Klein and Wright move to dismiss the claims against them pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted,[1] and defendant McHale moves to dismiss Counts I and II of the complaint on the same grounds. The remaining defendant, Drexel Burnham Lambert, Inc. ("Drexel")[2] has filed a petition in bankruptcy.

Plaintiff, the National Bank of Yugoslavia (the "Bank"), brings this action against all defendants under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b) (1988), Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990), and section 12(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77$l$(2), as well as against Mr. McHale and Drexel for common-law fraud and negligent misrepresentation.

The claims arise out of a series of transactions in which the Bank placed approximately $71 million with Drexel (for investment, says the Bank; as short-term loans to Drexel, say defendants) shortly before Drexel's bankruptcy. In this motion, defendants contend that the transactions did not involve "securities" within the meaning of the federal securities laws, and that those claims must be dismissed. The Bank counters that the notes it purchased from Drexel were "securities" under the circumstances.

## BACKGROUND

The complaint alleges the following:

The Bank is the central bank for the government of Yugoslavia, and is responsible for maintaining and investing Yugoslavia's monetary reserves and for its external liquidity. (Complaint ¶¶ 3, 17). Yugoslavian law requires that safety be its most important investment criterion, and accordingly "it invests Yugoslavian reserves directly or indirectly (i) with commercial banks ranking in the top 100 worldwide in terms of assets, or (ii) in high quality debt securities issued or guaranteed by governments of the most developed countries." (Complaint ¶ 17).

In June 1989, Mr. McHale, describing himself as a Drexel "Senior Economist," sent a telex to the Bank requesting a meeting concerning "central bank reserve management." (Complaint ¶¶ 20–21). The telex stated that Drexel was a leading financial intermediary with many central banks in various investment transactions. (Complaint ¶ 21). When Mr. McHale and an associate met with Bank representatives later that month, those representatives informed him of the Bank's conservative investment policy. (See Complaint ¶¶ 22–28). In reliance on Mr. McHale's statements that Drexel would act in accordance with those policies, the Bank promptly entered into a number of transactions with Drexel. (Complaint ¶¶ 26, 29–30).

On September 22, 1989, Drexel accepted 70 million deutsche marks from the Bank, and agreed to return it, with interest, on December 27, 1989. (Complaint ¶ 31). On September 27, 1989, Drexel accepted an additional $40 million from the Bank, and agreed to return that amount on December

1. Defendants' motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) is apparently based on their contention that the complaint fails to state federal securities laws claims. Since there is no contention that the Bank's securities laws claims are frivolous and interposed to manufacture jurisdiction, this motion is properly one to dismiss pursuant to 12(b)(6), rather than for lack of subject-matter jurisdiction. *Singer v. Livoti*, 741 F.Supp. 1040, 1043 (S.D.N.Y.1990).

2. This action involves Drexel and its subsidiaries, Drexel Burnham Lambert Group Inc. and Drexel Burnham Lambert Trading Corporation. For simplicity, those entities will be referred to individually and collectively as "Drexel."

29, 1989, with interest. (Complaint ¶ 33). The Bank believed that Drexel would invest those sums in accordance with its investment policy. (Complaint ¶¶ 32, 34).

Both transactions took place over the Reuters Screen System, a computer communications network. (Complaint ¶¶ 16, 31, 33). The parties negotiated some terms of the transactions, including the interest rate. Drexel stated that it would "borrow" the sums. The Bank said that it could "offer" and "give" the funds, and that it would "place" them with Drexel. (Affidavit of Francis Holozubiec sworn to March 11, 1991 exhibit B at 48, 53).

Later, the Bank and Drexel agreed to "roll over" the deposits. The Bank accepted postponement of the return of its money until February and March 1990, and the parties agreed upon different interest rates. (*Id.* at 114–15, 120; Complaint ¶¶ 33–38). The complaint characterizes both the initial transactions and the "roll overs" as "time deposits." (Complaint ¶ 38).

Contrary to Drexel's representations and the Bank's expectations, Drexel did not invest the funds with top banks or in high-quality government or government-backed debt securities. (Complaint ¶ 40). Rather, Drexel used the money for itself, to alleviate its liquidity problems. (Complaint ¶ 40).

In February 1990 Drexel informed the Bank of Drexel's liquidity problems and that approximately $71 million of the funds could not be returned. (Complaint ¶¶ 48–49). This action followed.

The Bank alleges that the individual defendants other than Mr. McHale, who are Drexel officials, are liable as "controlling persons" under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and section 15 of the 1933, 15 U.S.C. § 77o. It asserts that Mr. McHale is liable as an aider and abettor of Drexel's primary securities fraud. (Complaint ¶ 55).

## DISCUSSION

### I. The Standard for Dismissal

On a motion to dismiss for failure to state a claim, the allegations in the complaint must be taken as true. They are read in the light most favorable to the plaintiff. The complaint must not be dismissed unless it appears beyond question that plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

The parties dispute whether their Reuters Screen System communications may be considered in deciding this motion. The complaint refers to the Reuters Screen System communications, which are integral to the time deposits and the Bank's claims. Their terms are undisputed, and the Bank has submitted them in connection with this motion. Therefore, the communications may be deemed incorporated by reference into the complaint, and they will be considered here. *See Feder v. Macfadden Holdings, Inc.,* 698 F.Supp. 47, 50 (S.D.N.Y.1988); *see also Field v. Trump,* 850 F.2d 938, 949 (2d Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Furman v. Cirrito,* 828 F.2d 898, 900 (2d Cir.1987).

However, their significance will be evaluated in light of the Bank's allegations that they were but a part of its overall relationship with Drexel.

### II. Notes as Securities

#### A. *The Statutes*

Section 2 of the 1933 Act states: "When used in this subchapter, unless the context otherwise requires—(1) The term 'security' means any note...." 15 U.S.C. § 77b. Section 3(a)(3) excludes from the coverage of the 1933 Act

> Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days

of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 77c(a)(3).

However, this exemption does not apply to claims under section 12(2) of the 1933 Act, such as those the Bank asserts here. *See* 15 U.S.C. 77*l* (2) (anti-fraud provision of 1933 Act applies to any person who "offers or sells a security (whether or not exempted by the provisions of section 77c of this title ...)")

Section 3(a) of the 1934 Act states:

When used in this chapter, unless the context otherwise requires—

(10) The term "security" means any note ... but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a).

### B. *Reves v. Ernst & Young*

In *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), the Supreme Court adopted the Second Circuit's "family resemblance" test for determining whether a particular note is a "security" under the federal securities laws.

■ Under that test, any note with a term of more than nine months is presumed to be a security[3] unless it bears a strong family resemblance to one of a list of instruments which, although commonly called "notes" have been determined not to be "securities," or unless the defendant can show that the note should be added to that list. *Id.* 110 S.Ct. at 950–51.

■ Whether the note in question bears a strong family resemblance to the list of excluded instruments is evaluated by examining: (1) the motivations that would

prompt a reasonable seller and buyer to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. *Id.* 110 S.Ct. at 951–52. "If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors." *Id.* 110 S.Ct. at 952.

### C. *Application of Reves*

Defendants argue that the time deposits (1) bear a strong family resemblance to one of the notes on the list of excluded instruments; (2) should be added to that list under the four *Reves* factors; and (3) are exempt from the securities laws because they had maturities of less than nine months.

#### 1. Strong Family Resemblance

■ Defendants argue that the time deposits are similar to "notes evidencing loans by commercial banks for current operations," one of the instruments on the list of notes not covered by the federal securities laws. *See id.* 110 S.Ct. at 951 (citing *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir.1984)).

Under the allegations in the complaint, the time deposits bear little resemblance to such loans. The Bank is not a commercial lending institution, but the central bank of a sovereign state. The manner in which the transactions occurred was unlike a commercial loan. There was no such documentation and scrutiny of the "borrower" as customarily would accompany a loan of this size. The Bank did not retain authority over Drexel's finances, nor monitor its use of loan proceeds. *See Equitable Life*

---

**3.** Defendants argue that since the time deposits had a maturity of less than nine months, they are presumed not to be a security. *See Varnberg v. Minnick*, 760 F.Supp. 315, 325 (S.D.N.Y.1991) (citing *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1137–38 (2d Cir.1976)). The Supreme Court interpreted the law of this circuit differently, stating that in the

Second Circuit, "No presumption of any kind attached to notes of less than nine months duration," although the Court did not reach the issue. *Reves*, 110 S.Ct. at 951 n. 3.

In any event, since the nine months exemption does not apply to the notes in this case, *see infra* p. 1017, any presumption against the notes being securities does not apply here.

*Assurance Soc'y v. Arthur Andersen & Co.,* 655 F.Supp. 1225, 1235–39 (S.D.N.Y.1987) (note that business gave to insurance company with extensive documentation and control over business' operations was not "security"). Such precautions are fundamental to a commercial bank's ability to reduce the risk of its loans, and render the application of the securities laws in such transactions less important. *See Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1261–62 (9th Cir.1976) (Wright, J., concurring); *see also Equitable Life,* 655 F.Supp. at 1238–39.

Defendants argue that the Bank was able to protect itself like a commercial lending institution, and failed to do so. They argue that its capacity to protect itself shows that the time deposits bore a strong family resemblance to a commercial bank loan for current operations.

However, nothing in the complaint or the parties' communications shows that Drexel would have accepted such scrutiny, or that terms of the transaction would have been the same had it done so. Moreover, the fact that the Bank did not seek or apply the customary safeguards attendant to commercial loans shows that it did not contemplate, and members of the investing public examining the transactions would not have viewed them as, commercial loans.

### 2. The *Reves* Factors

Since the time deposits do not resemble notes that are not "securities," the next step under *Reves* is to use its four factors to determine whether the time deposits should be added to the list. *Reves,* 110 S.Ct. at 952.

#### a. *Motivations Prompting a Reasonable Seller and Buyer to Enter into the Transaction*

The Supreme Court in *Reves* stated with respect to this factor:

> If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct

for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

110 S.Ct. at 951–52.

Here, the reasonable motivations of the parties are alleged as more akin to those of parties to a securities transaction than to a consumer or business credit arrangement. The Bank placed its funds with Drexel on the understanding that they would, in turn, be placed in specific, safe investments, rather than used for Drexel's operating expenses or purchases. The Bank's interest lay in the profit that the note was to generate, but also in the safe return of its principal; and if Drexel believed that it could use the funds for its own purposes, the Bank did not.

Defendants point out that the time deposits' interest rates were fixed, while the rate in *Reves* fluctuated to stay above those of local financial institutions. *See id.* 110 S.Ct. at 952–53. They argue that the fixed interest rates weigh in favor of finding that the time deposits were not securities. Nevertheless, a fixed interest rate is a feature of many notes undoubtedly covered by the federal securities laws.

Drexel's use of the term "borrow" in its Reuters Screen communications with the Bank does not change that conclusion. The Bank itself did not use that word, and it may have been regarded as merely a convenient shorthand expression of Drexel's duty to return the funds on specified dates with interest. Taking the complaint as true, the use of the word "borrow" should not be given decisive significance.

#### b. *The Plan of Distribution of the Instrument*

Since there is no allegation that there was a secondary market for the time deposits, the Bank does not show that there was " 'common trading for speculation or investment' " in the notes. *Id.* 110 S.Ct. at 952 (quoting *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943)).

However, the absence of such an allegation is not fatal to the Bank's securities laws claims. A debt instrument may be

distributed to but one investor, yet be a "security." *Tannebaum v. Clark*, No. 88 C 7312 (N.D.Ill. Mar. 18, 1991) (available on WESTLAW, 1991 WL 39671). Any other interpretation of *Reves* would contradict the Supreme Court's determination that in the federal securities laws Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves*, 110 S.Ct. at 949.

Moreover, the Bank asserts that discovery may show that Drexel engaged in other transactions similar to these: it may be that the time deposits were not the only ones of their kind, and the Bank not their only purchasers.

### c. *The Reasonable Expectations of the Investing Public*

■ Since there is no evidence the public either invested in this manner, or knew of its existence, one is left to speculate what the investing public would expect. It might reasonably view the obligations as securities. The Bank placed its funds with Drexel, at the time a major investment banking and securities underwriting firm, in return for a fixed rate of interest. The funds were to be invested in particular, safe securities. Thus the transactions (if accurately described in the complaint), were investment instruments, rather than consumer or commercial bank loans or financing.

Defendants argue that *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), which held that a certificate of deposit with a fixed rate of interest issued by a federally-regulated bank is not a security, supports their position here. They contend that the Court's determination that the "unique agreement, negotiated one-on-one by the parties, is not a security," *id.* at 560, 102 S.Ct. at 1225, shows that the investing public would not consider these deposits to be securities.

However, the language that defendants quote from *Marine Bank* is from the Court's determination that another transaction, an agreement to pledge a certificate of deposit to guarantee a business loan in exchange for profits from the business, rights to veto future borrowing and rights

to use a pasture and barn, was not a security. *See id.* at 552–53, 559–60, 102 S.Ct. at 1221–22, 1225. The Court's determination that a federally-regulated bank's certificate of deposit is not a security, by contrast, turned on the highly-regulated nature of such institutions and the fact that their deposits are insured by the Federal Deposit Insurance Corporation, rather than any public perception of such instruments. *Id.* at 557–58, 102 S.Ct. at 1224–25. Such risk-reducing factors are absent here.

### d. *Whether Some Factor Such As the Existence of Another Regulatory Scheme Significantly Reduces the Risk of the Instrument*

■ It is undisputed that there is no regulatory scheme which so significantly reduced the risk of the time deposits as to make application of the federal securities laws unnecessary. However, defendants argue that similar protection is available from the short duration of the notes, as well as federal bankruptcy law and state common law.

The short maturities of the time deposits do not, by themselves, satisfy this factor, since notes of certain new or financially unstable enterprises, though of short maturities, may entail substantial risk. The brief duration of these uncollateralized, unsecured instruments does not afford protection comparable to the substantial safeguards of the federal securities laws.

As for the federal bankruptcy and common law, such protections are available in any transaction, including ones that are clearly securities transactions, and they existed at the time Congress perceived the need for the additional protections of the 1933 and 1934 Acts. They are nothing like the comprehensive regulatory and insurance scheme that was found sufficient to exempt certificates of deposits in *Marine Bank*.

\* \* \*

In summary, three of the four *Reves* factors weigh in favor of finding that the deposits were "securities," and the fourth cannot sensibly take this investment transaction outside the federal securities laws. Accordingly, under the *Reves* test, as pleaded the transactions involved "securities."

### 3. Exemptions for Maturity Dates of Less Than Nine Months

Defendants argue that because the time deposits had maturities of less than nine months, the 1933 and 1934 Acts exempt them from their definitions of "security."

 However, the exemption for short-term notes in the 1933 Act does not apply to claims under section 12(2). 15 U.S.C. § 77*l*(2). Accordingly, the Bank's claims under that section are unaffected by the short maturity of the notes.

 Under the 1934 Act, the nine-month exemption is part of the definition of "security" in section 3(a)(10), and thus the terms of the statute facially exclude the time deposits from the provisions of that act.

However, the Second Circuit, in accord with the other circuits that have considered the issue, has held that the nine-month exemption in section 3(a)(10) is not to be applied literally. *See Reves,* 110 S.Ct. at 955–56 (Stevens, J., concurring). Instead, invoking section 3(a)'s prefatory language, "unless the context otherwise requires," courts hold that Congress intended the exemption to apply only to certain prime-quality commercial paper. *See Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795, 799–800 (2d Cir.) (Friendly, J.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *see also Franklin Sav. Bank v. Levy,* 551 F.2d 521, 527–28 (2d Cir.1977); *Singer v. Livoti,* 741 F.Supp. 1040, 1047–48 (S.D.N.Y.1990).

While the majority did not reach this issue in *Reves,*[4] the four dissenters in that case contended that under the plain terms of the statute, notes of a duration of less than nine months are exempt from the 1934 Act (*Reves* did not involve the 1933 Act), and that the arguments for going beyond

its terms were unconvincing. *Reves,* 110 S.Ct. at 958–60 (Rehnquist, C.J., dissenting).[5]

While the view of the dissenters in *Reves* may ultimately command a majority of the Supreme Court, at the present time this court is bound by the established precedent of this circuit. There is no ground for finding, at this point, that the time deposits were the sort of prime-quality commercial paper contemplated by the nine-month exemption in section 3(a)(10). Taking the complaint as true, the notes are alleged to have been of poor quality.

### CONCLUSION

Defendants' motion to dismiss is denied.

---

4. The majority found that the demand notes in that case had a duration of more than nine months, and thus the exemption did not apply. *Reves,* 110 S.Ct. at 955. The dissent argued that the notes had a maturity of less than nine months, and thus reached the question of the effect of the nine-month exemption in § 3(a)(10).

5. Plaintiffs argue that the dissent in *Reves* would have exempted notes of less than nine-months duration from the operation of both the 1934 and the 1933 Acts. They state that the

*Reves* dissent would hold that such notes were one of the exceptions Congress intended when it added the language "unless the context otherwise requires" to the definition sections of both acts.

However, the *Reves* dissenters based their arguments on the plain terms of the 1934 Act. *Reves,* 110 S.Ct. at 960. That position is incompatible with exempting short-term notes from § 12(2) of the 1933 Act, since the plain terms of that section state that the short-term exemption is inapplicable to it. *See* 15 U.S.C. § 77*l*(2).