**Denise LeBrun, wife of/and Dale J. LEBRUN, et al.**

v.

**Robert W. KUSWA, BK Enterprises, and Tomorrow, Inc.**

**No. CIV.A. 98–1428.**

United States District Court, E.D. Louisiana.

Oct. 26, 1998.

Stephen Kenneth Conroy, Christine W. Marks, Griffith & Conroy, LLC, Metairie, LA, for Plaintiffs.

Phillip Krch Wallace, Phillip K. Wallace, Attorney at Law, Slidell, LA, for Defendants.

## ORDER AND REASONS

PORTEOUS, District Judge.

### I. BACKGROUND

Plaintiffs, Denise LeBrun, wife of/and Dale J. LeBrun, Nancy Ancar, wife of/and Terry L. Ancar, Catherine Barr, wife of/and William L. Barr, David M. Keller, Catherine McMullen, wife of/and Joel T. McMullen, and Sandy Peyton, wife of/and Kevin Peyton (hereinafter collectively referred to as "plaintiffs"), have filed suit against defendants, Robert W. Kuswa (hereinafter "Kuswa"), BK Enterprises, and Tomorrow, Inc., alleging federal security fraud and breach of promissory notes. With regard to the federal securities fraud, the complaint of the plaintiff alleges that the defendants have violated the Federal Securities Exchange Act of 1934, § 10(b) as amended, 15 U.S.C.A. § 78j(b); and 17 C.F.R. § 240.10b–5.

Defendant Tomorrow, Inc. is in the business of manufacturing, distributing and selling commercial desiccant filters for coolers ("Moisture Controllers"), residential filters ("Food Savers") and mega freeze freshener central systems (hereinafter collectively referred to as "the Products"). Since 1990, plaintiff Dale LeBrun has been in the business of manufacturing metal parts and components. Commencing in 1995, Dale LeBrun was a vendor/supplier of Tomorrow, Inc., most notably performing certain work in manufacturing metal brackets which house the Products.

Dale LeBrun and defendant Kuswa had discussed on several occasions the Products of Tomorrow, Inc., and during 1995 Kuswa and LeBrun discussed the need for operating capital to continue the production, manufacture and sale of the Products. Pursuant to these discussions, LeBrun agreed to provide a loan to Tomorrow, Inc. for the capital funding of the business. Furthermore, LeBrun agreed to contact his friends and family to promote the Products of Tomorrow, Inc. and to seek to obtain additional funds for operating capital.

Thereafter, LeBrun obtained the commitment of friends and family to provide approximately $105,000.00 of loans to Tomorrow, Inc. for capital operations of the business. "Agreements to Borrow Monies" were executed by the following plaintiffs and the defendants as follows:

| | | |
|---|---|---|
| Dale and Denise LeBrun | 12/19/95 | $ 20,000.00 |
| David M. Keller | 12/30/95 | $ 20,000.00 |
| William and Catherine Barr | 01/09/96 | $ 20,000.00 |
| Joel and Catherine McMullen | 01/23/96 | $ 20,000.00 |
| Nancy and Terry Ancar | 01/23/96 | $ 20,000.00 |
| Kevin and Sandra Peyton | 01/25/96 | $ 5,000.00 |
| **TOTAL** | | **$105,000.00** |

With regard to each separate loan transaction, there was an executed document entitled an "Agreement to Borrow Monies" (hereinafter "Loan Agreements"). These form documents were drafted by Tomorrow, Inc. through its officer and representative Kuswa. The Loan Agreements provided that the defendants would "repay the initial amount borrowed within twelve months from the date of execution of this agreement." The Loan Agreements also provided that the defendants were to pay interest quarterly based on certain sales, or "100% of the initial amount borrowed, which ever is greater."

There has been a series of communications between several of the plaintiffs and the defendants through the United States Mail. First, plaintiffs Dale and Denise LeBrun and David Keller received a letter in January, 1996 from BK Enterprises whereby defendant Kuswa requested to extend the plaintiffs' "investment contract" by thirty days, citing production delays as the reason for extension. (Exhibit G of Complaint). Furthermore, these plaintiffs have received periodic quarterly reports since July, 1996 referring to them as "investors." They have received only sporadic and minimal payments on these from the defendants.

Moreover, in August, 1996, when plaintiff Joel McMullen wrote the defendants demanding immediate repayment of his loan, plus all interest due, defendant Kuswa replied to plaintiff's letter stating that to "reimburse your investment," Kuswa would have to find "another investor" to replace him, a condition not part of the loan agreement. In addition, another set of communications occurred between plaintiff Terry Ancar and defendant Kuswa. In December, 1997, defendant Kuswa wrote a letter to plaintiff Terry Ancar requesting that he enter into a "new investor's contract for venture capital" as of January 1, 1998, which would have an investment rate of return of $0.05 per individual residential unit sold, $0.25 per individual commercial unit sold, or a "ten percent rate of return on investment per year until original capital investment is repaid." In January, 1997, plaintiff Ancar rejected a previously proposed new agreement in the form of a promissory note, and demanded repayment of the amount due him under the original Loan Agreement. The Loan was never repaid, and the defendants continued to communicate with Ancar, indicating that their cash flow was slow at the present time, but "our future is very promising," as well as proposing alternative methods of repayment that alluded to the original Loan debt as being "venture capital."

The plaintiffs, in their motion for summary judgment, move for this Court to find for the plaintiffs on the grounds that the Loan Agreements in question are promissory notes which have matured over a year ago, and said notes have not been repaid by the defendants. *See* Doc. # 8. Plaintiffs claim that the defendants have defaulted on these Loans, having failed to pay back the principal as well as the interest owed on the notes. *Id.* Because the defendants have breached the promissory notes, the plaintiffs claim that they are entitled to a judgment against the defendants as a matter of law. *Id.*

The defendants oppose the plaintiffs' motion for summary judgment, stating that the plaintiffs have asserted a flawed cause of action under Federal Securities Law, and as such, are attempting to establish jurisdiction before this Court when there is none. *See* Doc. # 11. Defendants claim that the promissory notes at issue are not securities within the definition of the Federal Securities Exchange Act, 15 U.S.C.A. § 78j(b) or 17 C.F.R. § 240.10b–5; therefore, there can be no securities violation under federal law and, accordingly, no federal jurisdiction. *Id.* Furthermore, defendants state that there are material facts as to whether the proper parties were named as defendants in this action,[1] and as to whether the plaintiffs are in fact the present holders of the Loan Agreements. *Id.*

Moreover, the defendants have filed a motion to dismiss pursuant to FRCP 12(b)(6). In this motion the defendants once again point to the fact that this Court lacks original jurisdiction because of the absence of a federal question and diversity. *See* Doc. # 5. Defendants claim that the Loan Agreements do not meet the definition of securities as either promissory notes or "investment contracts" under the applicable federal law. *Id.* Thus, the defendants assert that the transactions at issue are private transactions properly governed by Louisiana state law. *Id.* Accordingly, the defendants move this Court to decline to exercise pendent jurisdiction over the state law claims that would remain should the Court find that the Loan Agreements do not meet the tests and requirements of the Securities Exchange Act of 1934 § 10(b) as amended, 15 U.S.C.A. § 78j(b) (hereinafter "§ 75j(b)") or 17 C.F.R. § 240.10b–5.

Plaintiffs contend that they entered into the Loan Agreements with defendants thinking the documents to be promissory notes. *See* Doc. # 10. However, they claim that the defendants made it clear to them, through unilateral actions, that defendants were treating the transactions as securities. *Id.* That being the case, the plaintiffs allege that they are entitled to damages for fraud under § 78j(b) of the Securities Exchange Act or 17

---

1. Defendants claim that Kuswa, Chief Executive Officer of Tomorrow, Inc., and BK Enterprises, an unincorporated division of Tomorrow, Inc., were improperly named as parties in this suit due to their lack of legal standing in this case. Defendants assert that tomorrow, Inc. can be the only defendant in this matter.

C.F.R. § 240.10b–5. *Id.* Moreover, the plaintiffs claim in the alternative that should this Court find the Loan Agreements not to be securities, then the Court should exercise pendent jurisdiction and grant plaintiffs' motion for summary judgment as to their breach of contract claim under Louisiana state law. *Id.*

## II. *LEGAL ANALYSIS*

### A. *Whether the Loan Agreements Are Securities Under 15 U.S.C.A. § 78c(a)(10)*

The definition of a "security" is defined in the Securities Exchange Act as follows:

> The term **"security"** means **any note**, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, **investment contract**, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C.A. § 78c(10) (hereinafter "§ 78c(10)") (emphases added). In the case before the Court, the plaintiff argues that the Loan Agreements are investment contracts or, in the alternative, promissory notes that fall under the definition of "securities." *See* Doc. # 's 8, 10.

The Court finds that the most applicable case to the facts at hand is the United States Supreme Court opinion in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (hereinafter *"Reves"*). In that case the Farmers Co–Op sold promissory notes payable on demand by the holder. *Id.* at 58, 110 S.Ct. 945. Offered to both Co–Op members and non-members and marketed as an "Investment Program," the notes paid a variable interest rate higher than that of local financial institutions. *Id.* at 58–59, 110 S.Ct. 945. The Co–Op advertised these notes as "investments," which were said to be backed up by the assets of the Co–Op. *Id.* at 59, 110 S.Ct. 945. Following the Co–Op's bankruptcy, the holders of the notes filed suit against the Co–Op, alleging that it had violated the anti-fraud provisions of the Securities Exchange Act. *Id.* At the time the suit was filed, over 1,600 people held notes worth a total of $10 million. *Id.*

While the district court applied the test created in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (hereinafter *"Howey"*) (a test utilized to determine whether an instrument is an "investment contract") to determine whether the Co–Op's instruments were "notes" falling under § 78c(10)'s definition of a "security," the Supreme Court ruled against the application of the *Howey* test to the instruments at issue in *Reves*. *Id.* at 64, 110 S.Ct. 945. In rejecting the utilization of the *Howey* test to notes, the Supreme Court in *Reves* reasoned as follows:

> We reject the approaches of the courts that have applied the *Howey* test to notes; *Howey* provides a mechanism for determining whether an instrument is "an investment contract." The demand notes here may well not be "investment contracts," but that does not mean they are not "notes." To hold that a "note" is not a "security" unless it meets a test designed for an entirely different variety of instrument "would make the Acts' enumeration of many types of instruments superfluous," ... and would be inconsistent with Congress' intent to regulate the entire body of instruments sold as investments ....

*Id.* (citations omitted).

In the matter at issue, the plaintiffs seem to argue that the instruments (Loan Agree-

ments) are both "investment contracts" and "notes." *See* Doc. # 10. However, both the plaintiffs and the defendants agree ultimately that the *Reves* test for determining whether promissory notes are securities is the proper analysis in this case. *See* Doc. # 's 5, 10. The Court finds as well that the *Reves* test should be applied. Despite the defendants' apparent unilateral attempts to reclassify the transactions as "investment contracts," these instruments are in fact "notes" and should be construed as such.

Before analyzing the "family resemblance" test for notes set forth in *Reves*, the Court will examine the rationale behind the Securities Exchange Act and its definition of "security." The court in *Reves* states as follows:

> The fundamental purpose undergirding the Securities Act is "to eliminate serious abuses in a largely unregulated securities market." ... In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of the "countless schemes devised by those who seek the use of the money of others on the promise of profits," ... and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"

*Reves*, at 60–61, 110 S.Ct. 945 (citations omitted). Thus, Congress did not attempt to cabin the scope of the Securities Exchange Act, but rather enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment. *Id.* at 61, 110 S.Ct. 945.

However, it is clear that Congress did not "'intend to provide a broad remedy for all fraud.'" *Id.* (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982)) (hereinafter "*Weaver*") The task of determining which of the countless financial transactions in our society come within the coverage of the Securities Exchange Act has fallen to the Securities and Exchange Commission ("SEC"), and ulti-mately to the federal courts. *Id.* The *Reves* court finds that "[i]n discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transactions under investigation.... Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *Id.* (citation omitted); *see also Weaver*, at 556, 102 S.Ct. 1220 (noting that the broad statutory definition of "security" must nevertheless be considered in light of the *context* of the transactions).

Therefore, the court in *Reves* concluded that the phrase "any note" in § 78c(10) "must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Id.* at 63, 110 S.Ct. 945. The majority of the Courts of Appeals considering this issue have adopted an approach which distinguishes notes based on whether the notes are issued in an investment context (which are "securities") from notes issued in a commercial or consumer context. *Id.* While the Supreme Court in *Reves* embraces the "family resemblance" test and not the "commercial/investment" test, the context and economic realities of the transaction must still be considered. *Id.* at 61–63, 110 S.Ct. 945. An instrument cannot be a security unless it is also an investment in some sense.

Having examined the above-stated rationales, the Supreme Court has established the "family resemblance" test to determine whether a note is a security under the meaning of the Securities Acts. *Id.* at 65–67, 110 S.Ct. 945; *see also Trust Company of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478, 1489 (5th Cir.1997) (hereinafter "*Trust Company*"). Under the *Reves* test, the Court begins with a presumption that every note is a security; nonetheless, this presumption can be rebutted only by a showing that it more closely resembles the "family" of instruments found not to be securities. *Id.* at 65, 67, 110 S.Ct. 945; *see also Trust Company* at 1489. That family includes the following:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the

note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.

*Reves*, at 65, 110 S.Ct. 945. Then, if the instrument is not sufficiently similar to an item on the family resemblance list, four factors are evaluated to ascertain whether the instrument at issue is in another class that should be added to the list of non-securities. *Id.* at 67, 110 S.Ct. 945; *see also Trust Company* at 1489.

The four factors utilized for determining whether an item should or should not be added to the list of non-securities are as follows:

> (1) the *transaction* is examined to assess the motivations that would prompt a reasonable seller and buyer to enter into it
> (2) the *"plan of distribution"* of the instrument is examined to determine whether it is an instrument in which there is "common trading for speculation or investment"
> (3) the *reasonable expectations of the investing public* are considered
> (4) an inquiry into *the existence of another regulatory scheme*, which would significantly reduce the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Reves*, at 66–67, 110 S.Ct. 945. The courts are to use these four factors to explore the "economic realities" of the transaction.

The Supreme Court's adoption of this four-factor test illustrates a commitment of the Supreme Court to regulate securities transactions for the protection of investors, while not overburdening the business community. However, in *Reves*, the Supreme Court failed to state the method for applying these factors. The language is ambiguous as to whether all four factors must be met, or whether a balancing approach should be utilized.[2] While this Court concludes that a balancing approach is most suitable, the relative weight to be assigned to each factor remains unclear.[3] This Court will employ the balancing test, keeping in mind that the economic realities must be considered.

■ The first factor in an examination of the economic realities of the transaction is to assess the motivations that would prompt a reasonable seller and buyer to enter into it:

> If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit that the note is expected to generate, then the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

*Reves*, at 66, 110 S.Ct. 945 (citation omitted). The motives of both parties and the intended use of the proceeds by the issuer of the note must be examined to determine if this was an investment transaction motivated by profit.[4]

---

**2.** *See* Scott D. Museles, Note, *To Be Or Note To Be a Security: Reves v. Ernst & Young*, 40 Cath. U.L.Rev. 711, 746–748 (1991) (hereinafter "Museles, *Security*") The fourth "risk-reducing" factor should be analyzed first. If another regulatory scheme is not present, an examination of the other three factors becomes essential. This note reasons further that:

> The Court's language [in *Reves*] is far more ambiguous with respect to the application of the other three factors. If the Court intended a balancing approach with respect to these factors, the predictive capacity of the test would be reduced because the Court failed to give the relative weights of each factor. A balancing approach, however, is consistent with the Court's desire for flexibility and its

concern that sophisticated promoters could easily circumvent a more rigid test.

Moreover, because the motivations and expectations of factors one and three are generally unclear (and/or multiple), the *Reves*' family resemblance test will often hinge on factor two—the "plan of distribution.".

**3.** *See* Museles, *Security*, at 746 ("A balancing approach ... is consistent with the Court's desire for flexibility and its concern that sophisticated promoters could easily circumvent a more rigid test.").

**4.** *See Reves*, at 68 n. 4, 110 S.Ct. 945 ("We emphasize that by 'profit' in the context of notes, we mean 'a valuable return on an investment,' which undoubtedly includes interest." Profit

In *Reves,* the Farmers Co–Op sold the notes in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest. *Id.* at 67–68, 110 S.Ct. 945. The Supreme Court stated that, in fact, "one of the primary inducements offered purchasers was an interest rate constantly revised to keep it slightly above the rate paid by local banks and savings and loans." *Id.* at 68, 110 S.Ct. 945. The court in *Reves* found that the transaction was inherently viewed by both sides as "an investment in a business enterprise rather than as a purely commercial or consumer transaction"; therefore, the first factor weighed in favor of finding the transaction to be a "security." *Id.*

In the matter at issue, the notes were issued to provide operating capital for the defendants to continue the production, manufacture and sale of Tomorrow, Inc.'s products. The Loan Agreements stated that the money borrowed would be repaid within twelve months. The Loan Agreements also provided that all money received would constitute a loan and that the defendants would provide "quarterly interest" based on sales. In no event would the interest be less than 100% of the initial amount borrowed. The Court finds that the facts guide clearly to a determination that the notes at issue were investments in a business venture rather than purely commercial or consumer transactions. Thus, the first *Reves* factor weighs in favor of finding the notes to be securities.

■ The second factor in this analysis involves an examination of the *"plan of distribution"* of the instrument to determine whether it is an instrument in which there is "common trading for speculation or investment." *Id.* at 66, 110 S.Ct. 945. Since the primary purpose of the Securities Acts is to protect the business of investing (including the *investing public* and the financial act of investing), the offeror of the investment activates the public protection of the federal securities law through offering to a broad segment of the public.

The facts in the *Reves* case indicate that the notes were not traded on the exchange. *Id.* at 68, 110 S.Ct. 945. However, "the Co–Op offered the notes over an extended period of time to its 23,000 members, as well as to nonmembers, and more than 1,600 people held notes when the Co–Op filed for bankruptcy." *Id.* The Supreme Court held that an offering and sale to a "broad segment of the public" was all that was necessary to establish the requisite "common trading" in an instrument, and those things were present in this case. *Id.*

Additionally, the plan of distribution factor was discussed by the Fifth Circuit in *Trust Company,* where an investor (plaintiff) was schemed into investing (in the form of loans to various shell corporations) in what the investor believed to be a long distance telephone company. *Trust Company* at 1489. The court stated that although the notes were made out to the lender plaintiff, these notes were funded by the plaintiff's ERISA plan customers; thus, there existed a plan of distribution. The court explained as follows:

> The fact that there was no public distribution is not fatal to [plaintiff's] securities law claims. A debt instrument may be distributed to but one investor, yet still be a security.... Any other interpretation of *Reves* would contradict Congress' intent to enact a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.

*Id.* (citing *National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.,* 768 F.Supp. 1010, 1015–1016 (S.D.N.Y.1991)).

However, the language in *Trust Company* should be considered in light of the New York District Court case that the Fifth Circuit cited therein (*i.e., National Bank of Yugoslavia,* 768 F.Supp. 1010). Recognizing that there was no allegation that there was a secondary market for the time deposits, the court held that the Bank failed to show that there was "common trading for speculation or investment in the notes." *National Bank of Yugoslavia,* 768 F.Supp. at 1015. The court did not hold that the second *Reves*

with regard to notes means more than "capital appreciation" or "a participation in earnings,"

but includes interest.).

factor favored a finding of a security, but rather held that the absence of "common trading for speculation or investment in the notes" in the plan of distribution was not fatal to the argument that the transaction was a security. *Id.* at 1015–1016. Indeed, in the overall balancing test, the second factor seemed to weigh against a finding of a security. *Id.*

In the case at hand, the facts indicate that there was no common trading for speculation or investment in the notes, including no offering or sale to a "broad segment of the public." While this factor is not dispositive of the issue, it does weigh against finding the transactions in this matter to be securities.

■ Furthermore, the third factor involves the reasonable expectations of the investing public. *Reves,* at 66–67, 110 S.Ct. 945. In *Reves,* the Supreme Court states as follows:

> The court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction.

*Id.* at 66, 110 S.Ct. 945 (citations omitted). This is an objective factor whereby the Court must assess the beliefs of the investing public to determine whether there was a reasonable expectation that the instruments were securities, thereby affording the protections of the federal securities law. Holding that the third factor supported a finding that the notes in the case were "securities," the court in *Reves* indicated as follows:

> We have consistently identified the fundamental essence of a "security" to be its character as an "investment." ... The advertisement for the note here characterized them as "investments," ... and there were no countervailing factors that would have led a reasonable person to question this characterization.

*Reves,* at 68–69, 110 S.Ct. 945.

Moreover, the court in *Reeder v. Succession of Palmer,* 736 F.Supp. 128 (E.D.La. 1990), in dealing with the issue of whether postdated checks were securities, stated that because the checks were not publicly traded, it was unnecessary to examine the reasonable expectations of the investing public. *Reeder* at 131. However, assuming that the plaintiff investor and others like him were considered a part of the investing public, the checks did not satisfy the third prong of the *Reves* family resemblance test because "[t]he public's only expectation could be that of loan repayment with a fixed—albeit high—rate of interest." *Id.* The court found that this did not satisfy *Reves. Id.*

Based on the factual circumstances of the matter at issue, the third prong of the *Reves* test must be weighed against the finding of a security. The plaintiffs stipulate that they originally believed that the Loan Agreements were merely promissory notes, and only began to consider the status of the notes in terms of an investment when the defendants unilaterally commenced intimating, after the notes were executed, that the notes were in fact investments. After the fact recharacterizations cannot affect this prong. Furthermore, this Court should consider that the encouragement by the defendants for plaintiff LeBrun to approach his friends and family to obtain these loans for the defendants probably did not amount to an offering or sale to a "broad segment of the public." But assuming that the plaintiffs could be characterized as "investing public," their reasonable expectations were nothing more than the payment of the notes, plus the specified high interest. The Loan Agreements were unusual transactions not designed to be publicly traded. *See Marine Bank v. Weaver,* 455 U.S. 551, 560, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). Moreover, there was no advertising or marketing of these notes to the general public, but only a specific inquiry into a select group of individuals. Thus, the third factor weighs against the finding of a "security."

■ Finally, the fourth factor involves an inquiry into the existence of another regulatory scheme, which would significantly reduce the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. *Reves,* at 67, 110 S.Ct. 945. This component of the test is significant because the foremost threat to the investor is

the risk of losing his entire investment. However, the risk factor cannot be dispositive of the *Reves* test because there exists other commercial transactions that are not meant to be regulated under the securities laws which may be just as risky.[5]

The Supreme Court in *Reves* found that there was no risk-reducing factor that suggested that the instruments were not in fact securities. *Id.* at 69, 110 S.Ct. 945. Here, the notes were uncollateralized and uninsured. *Id.* In its analysis of the fourth factor, the court cited to *Marine Bank v. Weaver*, 455 U.S. 551, 557–558, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), which involved certificates of deposit which were uninsured by the FDIC and subject to substantial regulation under the federal banking laws. *Id.* The court noted that *Reves* differed from *Marine Bank* in that if the Securities Acts were held not to apply, the notes in *Reves* would escape federal regulation entirely.

Moreover, in *National Bank of Yugoslavia*, despite the defendants' argument that federal bankruptcy law and state common law afforded the plaintiff protection, the court held that there was no regulatory scheme that significantly reduced the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. *National Bank of Yugoslavia*, 768 F.Supp. at 1016. The court stated as follows:

> [T]he federal bankruptcy and [state] common law . . . protections are available in any transaction, including ones that are clearly securities transactions, and they existed at the time congress perceived the need for the additional protections of the 1933 and 1934 Acts. They are nothing like the comprehensive regulatory and insurance schemes that was found sufficient to exempt certificates of deposits in *Marine Bank*.

*Id.*

In the case at hand the fourth factor weighs in favor of finding the existence of a "security." Although the plaintiffs can seek state law relief for the breach of the promissory notes, there are no federal regulatory schemes affording the plaintiffs sufficient protection from risk.

■ Because there is no risk-reducing federal scheme, the Court must balance the first three factors to determine whether or not these notes should be added to the list of non-securities discussed above. Although it is possible to find that a note is a security even if one of the factors is not met, certain findings against application of the securities laws must be heavily weighed. The plan of distribution is perhaps the most essential factor.[6] This Court, having gone through the above analysis, and considering the facts and the appropriate standards of review, holds that these transactions are not "securities" under the *Reves* test for notes.

Accordingly,

IT IS ORDERED that, since the transactions at issue are not "securities" as governed by federal law, this matter is DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

IT IS FURTHER ORDERED that the Court denies to exercise its discretion to keep the state law claims in federal court. The Court reserves the right for the plaintiffs to assert their state law claims in state court.

IT IS FURTHER ORDERED that all other motions pending before this Court are DISMISSED AS MOOT.

---

**5.** *See* Michael A. Lueder, Note, *Securities Law— Presuming Notes are Securities. The Supreme Court Adopts Its Own Version of the "Family Resemblance" Test—Reves v. Ernst & Young*, 26 Wake Forest L.Rev. 503, 535 (1991).

**6.** *See* Museles, *Security* at 746–748 (Since the motivations of the buyer and seller and the public expectations are frequently unclear, when no regulatory scheme that reduces the risk exists, "the *Reves*' family resemblance test [often] hinges on the plan of distribution.")